PERDUE & HILL *v.* ROAD IMPROVEMENT DISTRICT No. 1.

Opinion delivered May 14, 1923.

1. HIGHWAYS—IMPROVEMENT DISTRICT—RIGHT TO SUSPEND WORK.— Where a contract for the construction of a road provided that the engineers "may stop the work for such period as they may deem necessary because of unsuitable weather or such other conditions as are considered unfavorable for the prosecution of the work," the action of the engineers in stopping the work was not a breach of the contract unless it was done arbitrarily or in bad faith.

2. HIGHWAYS—IMPROVEMENT DISTRICT—ABANDONMENT—ANTICIPATED PROFITS.—Under a contract for the construction of a road which stipulated that if the contractor refused to prosecute the work the cost of completing the work shall be deducted from any moneys due or that may thereafter become due the contractor, but that, if the expense incurred by the district "shall be less than the sum which would have been payable under the contract if it had been completed by such contractor, then the contractor shall be entitled to receive the difference," *held* that where the cost of completing the road was less than the contract price the contractor who abandoned the work was entitled to the amount of the difference.

Appeal from Cross Chancery Court; *A. L. Hutchins,* Chancellor; affirmed.

*Caldwell, Triplett & Ross,* for appellants.

The chancellor erred in finding that the contractors breached the contract. The district so harassed, obstructed and unnecessarily delayed the contractors in the work of construction as to justify the contractors in abandoning the work on account of expense entailed, not contemplated of the time the contract was made. It was a breach of contract to arbitrarily estimate and pay the contractors for work done in December and January upon a basis of 3,300 pounds of gravel to the yard, notwithstanding entered into by the district and appellants in conformity with a requirement of the proposal to do the work, fixing the measurement of a yard of gravel at 2,800 pounds. The contractors were arbitrarily suspended on Jan. 20, 1921, and suspension was permanent, and not contemplated by the contract, was not justified on account of unfavorable weather conditions, was without their consent, and such an interference with the contract as to constitute a breach of it, regardless of the obvious purpose of defendants to force the contractors to give up the contract and to relet it to Newell. The indefinite suspension of January 10 without prospect of resumption of work within a reasonable length of time was in itself a breach. A suspension of work can only be had for the causes specifically provided for in the contract. 68 S. E. 124; 67 W. Va. 503. The contractors did not agree to the suspension, nor did the weather conditions require it, and it constituted an actionable breach. 93 Ark. 477; 39 Sup. (U. S.) Ct. 102; 178 Pac. 906; 175 Mo. App. 165; 157 S. W. 811; 56 Pac. (Mont.) 316; 34 Wash. 238; 75 Pac. 815. They were entitled to anticipated profits as damages also, as well as expense of men and teams during suspension of work, for excavators' shortages, etc., and interest from May 1, 1921, the date proof shows appellants would have finished contract.

*S. W. Ogan* and *Killough, Lines & Killough,* for appellee.

There are, as stated by appellants, practically no issues in this case except those of fact.  There was no conspiracy on the part of the commissioners and their employees to take the contract from appellants and relet it to Newell or others.  The board had the right to suspend the work, under the terms of the contract, on account of bad weather conditions which required it. The method for determining measurement of gravel was not definitely agreed on before the beginning of work, and it could be thereafter correctly ascertained as was attempted to be done.  The appellants breached the contract by refusal to resume work under notice of April 30, 1921, from the board requiring them to do so.  The contractors, having breached the contract and abandoned the work, are certainly not entitled to anticipated profits. On cross-appeal it is insisted that the allowances to the contractors are excessive and erroneous.

SMITH, J.  Road Improvement District No. 1 of Cross County was organized in 1917 under the Alexander road law for the construction of an improved road from Wynne, at Station 0, to the Crittenden County line at station 980+35.  For some reason the improvement was not completed as planned, but, after the road had been built from Wynne to what is known as the "Bay," an arm of the St. Francis River, at station 405+85, the work was discontinued.

At the special session of the General Assembly of 1920 an act was passed for the relief of this district, which, among other things, appointed new commissioners, who advertised for bids for completion of the road. Appellants were the lowest bidders, and in April, 1920, a contract was awarded them for the construction of the road.

In their proposal to do the work appellants inserted a provision that the method of determining the measurement of a yard of gravel should be agreed upon between

themselves and the engineer of the district before beginning the work; and appellants insist that such an agreement was made, and that it was agreed that a yard of gravel should be fixed at 2,800 pounds, railroad weights.

It is undisputed that the parties had agreed to fix the rate which should constitute a yard of gravel, but it is denied by the district that a final agreement had ever been reached. This became a very important question in the litigation which arose between the contractors and the district, and the court found in favor of the contractors, and the district has appealed from that finding.

The contractors entered upon the work and proceeded with its construction, and were thus engaged when, on January 20, 1921, they received a notice from the engineer of the district reading as follows:

"Wynne, Ark., Jan. 20, 1921.

"Messrs. Perdue & Hill, Wynne, Ark.

"You are hereby notified that you will not be called on before the first of May, 1921, to resume your work under your contract with Road Improvement District No. 1 of Cross County. This does not mean that you will be authorized to resume work upon that date, but only that you will not be called upon before that time, the idea of the board being to suspend work until after the expiration of unfavorable weather conditions.

"W. S. NEWSUM, Engineer."

This notice suspended the work, and this litigation, which grew out of it, must be decided by a consideration of the conditions under which, and the purpose for which, the notice was given.

The contractors assert this notice was a breach of their contract, and afforded ample justification for this litigation. Of it we shall have more to say.

By this suit the contractors seek to recover for work and labor performed under the contract, and for damages for its alleged breach, and there is a counterclaim

by the road district to recover certain construction costs in completing the improvement.

The big question in the case is, Who breached the contract? And the court below decided that question in favor of the road district. Other questions grew out of this one, some of which were decided in favor of the contractors, while others were decided in favor of the road district; and the contractors have appealed, and there is a cross-appeal by the road district. These other questions will also be discussed.

The record is remarkable alike for its size and for the numerous irreconcilable contradictions in the testimony, and the conclusion one reaches depends entirely upon the testimony which is credited and accepted. The contractors present a story of wrong and oppression. They insist that the engineer of the district had colluded with certain of the commissioners, if not all of them, to so oppress them (the contractors) that they would be compelled to surrender their contract. It is asserted that the purpose of this oppression and corrupt plan was to give the work to another contractor, who was a favorite of one of the engineers and one of the commissioners.

We will not set out the testimony of the numerous witnesses, but we will give a summary of it. According to the contractors, the district's engineer was incompetent, inefficient and inattentive, and was rarely on the job. According to the engineer, he was over the job personally every other day, and the cause of the friction between himself and the contractors was not inattention but his assertion of the district's rights.

The contractors say the plans of the improvement were incomplete and insufficient, and were especially defective in failing to provide drainage. They also say the engineer did not furnish sufficient and proper grade stakes.

The plans complained of were those on which the contractors had based their bid, and they no doubt had the opportunity to familiarize themselves with these

plans before bidding. The engineer testified that the plans were not defective, and no delay occurred on that account; and, in regard to the grade stakes, the testimony on the part of the district is to the effect that no complaint on that account was ever made except upon one occasion, and the engineer was then called upon the carpet by the board, and explained that there were stakes at all places where he wished the work done, but the contractors were insisting on working at another place where there were no grade stakes.

The district appears never to have been satisfied with the weight agreed upon as constituting a yard of gravel, and, while it is admitted that there was an agreement fixing 2,800 pounds as a yard, it is insisted that this agreement was tentative and subject to correction, and that it was later ascertained that 2,800 pounds did not make a yard. On November 8, 1920, the engineer wrote the contractors that he had made a test of a car of gravel, and that a mistake had been made against the district, and the contractors were asked when they would be ready to join in an accurate test. The contractors answered this letter the next day, and stated in their reply that they were not interested in the subject, as 2,800 pounds had already been agreed upon as the weight of a yard of gravel, and estimates had been given and paid upon that basis, and they regarded the question as settled.

This is a very important item, but, without further recital of the testimony in regard to it, we announce our concurrence in the finding of the court below that 2,800 pounds of gravel constituted a yard, under the contract and agreement of the parties.

This and certain other contentions between the contractors and the engineer had resulted in friction and disagreement between them, and the contractors say they had become convinced that the engineer was not acting in good faith with them, and intended, by his exactions, to drive them off the job, and that he had the

active support of some, if not all, of the commissioners in accomplishing that result. It is contended that the notice set out above was a part of this plan, and was given for the purpose of depriving the contractors of the opportunity to earn the profit which compliance with the contract would have given them.

The testimony does show that construction costs had fallen materially between the date of the engineer's notice to them and the contract, and it is very earnestly insisted that the testimony also establishes the following facts: that the suspension of the work was unnecessary; that the reason assigned (the condition of the weather) was a mere subterfuge. In this connection, it is pointed out that the contractors were put to work in June following a month of unusual rainfall, and they were taken off the work following a period when the precipitation had been below the average for the preceding month. The records of the weather bureau show that November, 1920, had less rainfall than any November for three years preceding. The rainfall for December, 1920, was 6.48 inches, which was 1.70 inches above the average, but of this December rain 2.40 inches fell on December 22 and 2.30 inches fell on December 26.

The contractors also insist that the testimony not only shows that it was unnecessary to suspend work at all, but that it was wholly unnecessary to suspend for the long period intervening between January 20 and May 1, and that the engineers must have known, and did know, that the suspension would be very expensive to them, and would, in effect, drive them from the job, and did have that effect.

The commissioners and engineers denied categorically that they had any purpose of driving the contractors from the job. They admit the contractors were put on the job following a spring of unusual precipitation, but they say this was the season when the soil finally dries out.

The testimony does not impress us that January is a better month than June to build roads in the St. Francis bottom. Commissioners who had lived in that district for fifty years or more testified that the soil was largely gumbo, and that when it becomes thoroughly saturated in winter, it did not dry out until the spring, and they testified that it was after conference with the contractors that May 1 was fixed as the earliest date when the work could be resumed.

The testimony on the part of the district is to the effect that the commissioners understood the contractors were not objecting to the suspension of the work, but we are of opinion that the contractors did not consent. In fact, we think their attitude was one of protest against the suspension. However, we accept the statement of the commissioners that they did not understand the contractors had taken the position that the suspension of the work would be treated as a breach of the contract. The testimony shows that the commissioners had determined at the meeting of the board on January 10 to suspend the work, but had not then determined the period of suspension. The contractors frankly concede that they went to the board meeting on January 20 for the purpose of fortifying themselves for the prosecution of the litigation which they had already decided to institute. They admit this was their purpose, and to that end they brought their attorney to the meeting, but they say they did this because they had become convinced that litigation had become inevitable.

We have carefully considered the testimony in regard to the meeting of January 20, for it is upon the happenings there that the contractors predicate their cause of action. They say it was then and there the district breached the contract.

We have said that the contractors did not assent to the suspension of the work, but we are equally as certain that they never advised the commissioners, or the attorney for the district, who also attended the meeting

of January 20, that they would treat the suspension of the work as a breach of the contract. It may be that the commissioners would have ordered the suspension of the work even though the contractors had stated their position candidly, but their failure to say they would treat the suspension of the work as a breach of the contract does appear, in a measure, to support the contention of the commissioners that the suspension was ordered by the consent of the parties.

The attorney for the road district testified that he understood the contractors preferred to proceed with the work, but he did not understand they would treat the order of suspension as a breach. In fact, when the attorney for the contractors stated that they wanted the order of suspension in writing, the attorney for the district wrote up an agreement to that effect, and the district's attorney testified that the objection made to what he had written was that it appeared to be by consent, and this would not be satisfactory to the surety company which had made the contractors' bond, and that company would not agree to the suspension except upon the order of the district. Thereupon the attorney for the contractors dictated to the attorney for the district the notice set out above, the same being written as dictated, on the typewriter.

There are charges and countercharges of lack of candor and good faith. The contractors frankly admit that they had this notice so prepared as to serve their purpose in the litigation which they had already determined to bring. We think, under the circumstances, they should have stated that they would treat the suspension of the work as a breach of the contract.

The commissioners testified that they did not intend to discharge the contractors, and that they never suspected the contractors would not complete the work when called upon to do so, until they were served with summons notifying them the district had been sued. There was offered in evidence a letter from the engineer to the contractors dated Feb. 21, 1921, in regard to

spreading gravel on a certain part of the road. The contractors replied to this letter in one dated March 3, 1921, in which they stated that the board had taken from them any liability or discretion, and on that account they declined to act on the board's request; but not even in that letter was it stated that the contractors considered the contract at an end.

As soon as the notice of suspension had been delivered, the contractors repaired to Little Rock, where they employed three civil engineers to go over the district. These engineers immediately went over the district, and all testified that, in their opinion, the order of suspension was not justified by the condition of the road on which the contractors were proposing to place gravel, or on account of the state of the weather. The contractors insist that this testimony shows the weather had nothing to do with the suspension.

This testimony is by no means undisputed. Many landowners in the district testified that the road had become a long mud-bed, and in many places had become nearly impassable, and at once place for about a mile had become entirely so, and that, to enable the people to travel the road with any degree of safety from Princedale to Parkin, two points on the road, would have required the road to be planked like a bridge for a distance of two or three miles, and in some places this was done to make the road passable.

The commissioners insist their action in suspending the work, under the facts stated, was justified by a clause of the contract which reads as follows: "Temporary suspension of work. The board of engineers may stop the work, wholly or in part, for such period or periods as they may deem necessary because of unsuitable weather, or such other conditions as are considered unfavorable for the prosecution of the work, or for such time as they may consider necessary because of the failure on the part of the contractors to carry out orders given," etc.

This clause is in the contact, and we cannot refuse to give it effect. Of course, this clause did not authorize the commissioners to act arbitrarily or in bad faith; but, if their action in ordering the suspension was not arbitrary or in bad faith, the suspension of the work was not a breach of the contract. It could not be a breach of the contract for the commissioners to do a thing the contract authorized them to do; so if, in good faith, they did conclude that the conditions were too unfavorable to continue the work, they were within their rights in ordering the work suspended. *Williams* v. *Board of Directors,* 100 Ark. 166; *Drainage District* v. *Kochtitzky,* 146 Ark. 494; *Lewelling & Price-Williams* v. *St. Francis County Road Imp. Dist. No. 1,* 158 Ark. 91; *LeRoy* v. *Harwood.* 119 Ark. 418; *Whitener-London Realty Co.* v. *Ritter,* 94 Ark. 263; *Hot Springs Ry. Co.* v. *Maher,* 48 Ark. 522.

We do not think the testimony supports the appellants' contention that the commissioners did not act in good faith, and we conclude therefore that the suspension of the work did not constitute a breach of the contract. The chairman of the board testified that he said to one of the contrators, "You know I would like the best in the world for you all to stop until spring," and the contractor answered, "I think it is a good thing myself, but you need not say anything about it, or what I said, for I will deny it. Don't tell anyone I told you that." The contractor with whom this conversation is said to have occurred did not deny its occurrence.

On April 30 the engineer notified the contractors to resume work, but they did not do so, and they seek to excuse their failure to do so by saying that they did not believe the notice had been given in good faith.

One of the commissioners was asked: "Did not the board get this letter along about the 5th of May, asking, if they resumed work, what the board would do about the matter of determining gravel weights?" and answered: "I do not remember; the board might have got it."

The letter was not produced and does not appear in the record, and we do not know its contents, but nothing else appears anywhere in the record about it. We do not understand this letter gives any support to the proposition that the contractors would have returned to work if the commissioners had waived their position in regard to gravel weight. They nowhere say they would have done so. On the contrary, they admit the purpose then existing to sue the district in equity. In fact, they had instituted a suit at law on March ——, 1921, and had on April 20 taken a voluntary nonsuit with the expectation of suing in equity.

The court gave the contractors judgment for the retained percentage, and this we affirm. The court found that the gravel should be paid for on the basis of 2,800 pounds to the yard, and this we approve. The court allowed $108.51 for unestimated excavation, and this we approve, although the contractors say it should be more, and the commissioners say nothing should be allowed on that account.

We concur also in the other findings of the court, which we think require no discussion, except an item of $3,903.03, designated as difference in construction costs.

Appellants say the testimony shows their anticipated profits were $28,861.79, and that they should have a judgment for this amount in addition to the other allowances made them by the court, amounting in all to $42,515.83. The answer to this insistence is that they did not resume work, pursuant to the notice of April 30, and thereby earn the profits for which they now seek judgment.

But, notwithstanding the fact that we think anticipated profits were properly disallowed by the court below, we think the court properly allowed the contractors the item for difference in the cost of construction.

This seemingly anomalous result arises from section 61 of the contract, which reads as follows: "ANNULMENT OF CONTRACT. Should the contractor fail or refuse

to begin work under contract within the time specified, or fail or refuse to prosecute the work with sufficient rapidity and with such materials and equipment as, in the opinion of the engineer, is necessary to complete the work within the time specified, the engineer shall be empowered, ten days after he has given in writing a notice to the contractor and his surety, to secure such additional labor, equipment and material as may be necessary to properly proceed with the work. The cost thereof shall be deducted from any moneys due or that may hereafter become due the contractor. In case the expense so incurred by the board shall be less than the sum which would have been payable under the contract if it had been completed by such contractor, then the contractor shall be entitled to receive the difference; and in case such expense shall exceed the sum which would have been payable under the contract, then the contractor and the surety will be liable and shall pay to the State or board, as the case may be, the amount of said excess.''

This provision of the contract can have application only in the event of the failure of the contractors to comply with the contract in the particulars stated, and the parties have stipulated what the recovery shall be in that event. By this stipulation it is provided that, if the conduct of the contractors shall result in the annulment of the contract (the situation we have here), the district may complete the work, and charge the cost thereof to the contractors and their surety; and, to make the provision reciprocal, it is also provided that, if the cost of doing the work is less than the contract price, the contractor shall be entitled to the difference.

In other words, it is the purpose of this section of the contract to held the contractors and their surety liable for the cost of completing the work upon the failure of the contractors to complete it, even though this additional cost should run the total cost to a sum in excess of the contract price. with the reciprocal provi-

tion that the contractor shall be entitled to receive the difference, if the cost does not exceed the contract price.

This section of the contract is, in effect, a stipulation as to what the measure of damages shall be in the event the contractors do not complete the work; and we perceive no reason why the parties might not contract against that contingency.

Chief Justice McCULLOCH does not concur in this view, it being his opinion that the district should not be charged with this item of difference in cost of construction; but Justices WOOD and HUMPHREYS do concur with the writer and Justice HART on this item and make the opinion, although Justices WOOD and HUMPHREYS dissent on other features of the case, they being of the opinion that the suspension of the contractors constituted a breach of the contract, but on that question the Chief Justice joins with Justice HART and the writer in making the opinion of the court.

Upon the whole case we think the decree of the court below was correct, and we therefore affirm it.

McCULLOCH, C. J., (dissenting in part). I am unable to concur in the view that appellants, if they broke the contract by altogether quitting work without good cause, are entitled to recover anything on the work which the district caused to be done by another contractor after such breach was committed.

The principle is well established that the party who breaks a contract cannot make it the basis of an action to recover compensation under it, or otherwise make it the basis of an action against the other party. *Jerome Hardwood Lbr. Co.* v. *Beaumont Lbr. Co.*, 157 Ark. 220. The provision of the contract was not intended, I think, to disregard that well-settled principle, but was incorporated in the contract for the protection of the district. The contract merely authorized the district to complete the work—it was not obligated to do so. To use the language of the Supreme Court of the United States in construing a somewhat similar stipu-

lation in a construction contract with the government: "The stipulation is made for its benefit, and, being optional in form, cannot be construed into a covenant in favor of the defaulting contractor." *United States* v. *U. S. Fidelity & Guaranty Co.*, 236 U. S. 512.

The majority of the court concede that the effect of the contract, as construed by them, brings about anomalous results that are in conflict with settled principles of law, and I think that this demonstrates that the construction is erroneous. The language is not sufficiently definite to compel the conclusion reached by the majority, therefore that construction should not be adopted so as to overturn settled principles of the law.