BURKE CONSTRUCTION COMPANY v. BOARD OF IMPROVEMENT OF PAVING DISTRICT No. 20.

Opinion delivered November 12, 1923.

1. MUNICIPAL CORPORATIONS—PAVING CONTRACT—BREACH—REMEDIES. —Though a paving contract authorized the engineer of a street improvement district to complete the work, in the event of the contractor abandoning or failing to complete the work without unreasonable delay, and authorized the district to recover from the contractor the difference between the cost price and the contract price, such remedy was not exclusive, and did not preclude the district from bringing an action for damages upon a breach of the contract being committed.

2. MUNICIPAL CORPORATIONS—PAVING CONTRACT—BREACH.—The fact that a street improvement district, after notifying the contractor and its surety that the contractor was not proceeding with the work, proceeded to put the streets in passable condition, did not constitute an election to take over and complete the work under the contract, especially where the contractor, by securing an injunction in a suit against the district, prohibited it from proceeding to complete the work.

3. ACCOUNT—JURISDICTION OF CHANCERY.—The chancery court has jurisdiction of a suit to settle and adjust long and complicated accounts.

4. APPEAL AND ERROR—QUESTION NOT RAISED BELOW.—In an action by a street improvement district against a contractor for breach

of contract by abandonment, the contractor could not urge on appeal that the district could not have performed its part of the contract by making payments, if the contractor had completed the work, where such question was not raised by the pleadings and was not presented to the court below.

5. MUNICIPAL CORPORATIONS—PAVING CONTRACT—W A I V E R O F— BREACHES.—Breaches of its contract by a paving district were waived by the contractor where it subsequently agreed to extensions of the contract and continued operations thereunder.

6. MUNICIPAL CORPORATIONS—PAVING CONTRACT—BREACH.—Under the evidence, *held* that failure of a paving contract to complete his work during the time agreed upon in an extension of his original contract was a breach of the contract.

7. MUNICIPAL CORPORATION—PAVING CONTRACT—BREACH—INTEREST. —Upon a paving contractor abandoning its contract, the district was not entitled to interest on the cost of completing the improvement in excess of the contract price from the date of the breach of the contract to the date of the judgment, where the delay in completing the work resulted from the district's election to sue for damages instead of completing the work at once, as the district did not, in fact, expend the money on which it was asking interest.

8. DAMAGES—LIQUIDATED DAMAGES.—An improvement district, having recovered actual damages for breach of a paving contract, was not entitled to liquidated damages.

Appeal from Miller Chancery Court; *C. E. Johnson,* Chancellor; affirmed, with modification.

*James B. McDonough, Paul Jones, Webber & Webber* and *James B. Head,* for appellants.

1. The action is one to recover a money judgment for unliquidated damages for an alleged breach of contract. The contract was undisputed, there were no complicated accounts between the parties, and the amount of payments was undisputed. The mere difficulty of proving their case afforded no ground for equitable relief. The case should have been transferred to the law court. 57 L. R. A. 417; 165 N. W. 342; 200 U. S. 450; 119 U. S. 347; 138 U. S. 146; 140 U. S. 106; 101 Fed. 511; Simpkins, Federal Suits in Equity, 2d ed., 27-28; I Pomeroy, Equity Jur. § 237; 1 Ark. 31; 7 Ark. 520; 127 Ark. 318; 56 Ark. 391; 109 Ark. 537; *Id.* 171.

2. The action was premature. Section 16 of the contract provides a valuable and drastic remedy, one which was not only for the benefit of the district but also for the benefit of surety of the construction company, and this remedy is, by many courts, held as exclusive. 105 Fed. 741; 36 Fed. 481; 158 Fed. 850; 14 N. Y. S. 548. Whether in this case the remedy be held to be the sole remedy or merely optional, it is clear that the ordinary remedy under the law and that provided by the contract are inconsistent, and the district must have, at least, elected on the breach, if any, which remedy it would pursue. 20 C. J. 6; *Id.* 14; 41 So. 332; 78 S. W. 801; 98 S. W. 236. The district, as is conclusively shown by the evidence, made its election, and is bound by it. 126 N. Y. S. 256; 39 Atl. 885; 30 Atl. 21; 219 Fed. 387; 60 N. E. 419; 92 N. E. 666; 129 Ark. 275; 134 Ark. 117; 147 Ark. 581; 154 Ark. 561.; *Perdue & Hill* v. *Road Imp. Dist. No. 1,* 159 Ark. 117.

3. There was no justification for the engineer's action in arbitrarily making material changes in the character of the work and in quantities of materials, without any authorization on the part of the board. 104 Fed. 457; 88 N. E. 330; 82 N. E. 523; 92 Fed. 299; 99 Fed. 237; 186 U. S. 309; 274 Fed. 659.

4. It is unconscionable for the district to ask, and would be inequitable for the court to grant, any damages on account of the items of paving which were not constructed the first year, which, as shown by the testimony, resulted solely because the engineer and the district failed to designate where this work should be done. 248 U. S. 334, 340; Elliott on Contracts, § 3713; 2 Hudson on Building Contracts. 4th ed., 122; 102 N. Y. 205; 43 Barb. 33; 93 N. E. 81. The extension agreement did not operate as a waiver of the claim for damages arising from the failure to designate such paving in the first year, but only to substitute a new time for performance. It did not operate as a waiver of damages to the contractor for breaches of the contract. 9 C. J. 790; 274 Fed. 659.

5. The district breached the contract by withholding payment of the November estimate; and by its permitting the work to continue beyond the first of November, under the supervision and direction of its engineer, it waived any breach of the contract as to completion of the work by that date. 4 Elliott on Contracts, § 3714; 6 R. C. L., Contracts, 984, § 353; L. R. A. 272, note 5; 4 Atl. 566; 9 C. J., Building & Construction Contracts, 728, § 64; 9 C. J., 789, § 30; 11 S. W. 18; 24 N. E. 315; 27 N. E. 631; 9 C. J., 812, § 151; 76 N. W. 1093; 51 S. E. 638. Where, after the expiration of the time limit for performance of a contract, the owner insists upon or demands performance by the other party, he thereby confirms the existence of the contract and waives the delay of the contractor. 104 S. W. 975; 1 Otto 646, 656, 23 L. ed. 341; 54 N. W. 743; 66 N. E. 1010. See also 42 N. Y. Super. 176; 6 Ir. 577; 24 Ga. 478; 70 S. E. 201; 9 Cyc. 608; 70 S. E. 970; 102 Ark. 79; 98 Ark. 328; 91 Ark. 133. One who is himself in default may not insist on performance by the other. 88 Ark. 491; *Id.* 422; 93 Ark. 472; 158 Ark. 91; 64 Ark. 228; 67 Ark. 156; 148 Ark. 181; 35 Pac. 146.

6. The district, when it gave notice to the Burke Construction Company that it must perform its contract, the district was itself unable to perform its part of the contract. 94 So. 5.

*Frank S. Quinn, James D. Shaver* and *Arnold & Arnold,* for appellee.

1. Chancery has jurisdiction. Its jurisdiction is tested by the allegations of the complaint. 61 Ark. 564; 140 Ark. 480; 152 Ark. 50. When these show a necessity for an accounting, they are sufficient to give equity jurisdiction. 31 Ark. 345; 82 Ark. 547; 48 Ark. 426; 102 Ark. 343; 119 Ark. 276; 129 Ark. 197. In matters of accounting, chancery and the law courts have concurrent jurisdiction, but chancery is the more suitable forum. Appellant had no absolute right of trial by jury. 102 Ark. 276. The plaintiff's board of commissioners, as trustees of the funds and property of the district, had

the right to apply to a court of equity for aid and direction. 52 Ark. 546; 123 Ark. 258; 101 Ark. 455; 121 Ark. 85; 150 Ark. 63; 4 Ark. 302; 97 Ark. 588; 110 Ark. 475. Moreover, after so much delay, litigation and expense, it is too late to insist on a motion to transfer which was never pressed. It should be treated as waived. 134 Ark. 254.

2. The suit was not premature. 133 Ark. 286; *Id.* 302; C. & M. Dig. § 5737; 137 Ark. 386; 119 Ark. 506; 247 S. W. 393. The Federal court suit instituted by Burke gave the board an immediate right of action for breach of the contract. 236 U. S. 512; 245 S. W. 802.

3. The various items claimed by appellants on account of alleged breaches of the contract prior to the renewal or extension agreements were all waived by reason of such extension agreements, and appellants are estopped from claiming the same. 105 Ark. 421-432; *Id.* 233; 102 Ark. 79; 94 Ark. 9; 111 Ark. 362; 118 Ark. 465; 124 Ark. 141; 126 Ark. 14.

4. Where there is a continuance of operations under the contract, it constitutes a waiver of past forfeiture. 250 S. W. 1; 153 Ark. 606.

SMITH, J. The appellant construction company, hereinafter referred to as the company, made a contract with Paving District No. 20 of Texarkana, hereinafter referred to as the district, to construct the paving, curbing and guttering in the district. The contract is dated November 29, 1916, but appears to have been signed December 22, 1916, and there was attached to it a bond in the sum of $300,000, with the United States Fidelity & Guaranty Company and the two principal stockholders of the construction company as sureties, conditioned that the company should perform the work in accordance with the contract. The work was not completed within the year allowed by the original contract, and, by mutual agreement, the term was extended to November 1, 1918, and, not having then been completed, a second extension was made by consent of all parties to November 1, 1919.

On this last-mentioned date the work was unfinished, and the parties had thoroughly disagreed, and each charged the other with having breached the contract. The company quit work, and the district demanded that the work proceed. The district proposed a third extension, which the company agreed to sign provided E. F. Petersen, the engineer of the district, was discharged and another engineer was selected in his place. The company's letter containing this proposition was dated December 12, and, in a letter dated December 16, the district answered that the facts did not warrant the discharge of the engineer, and declined to do so. This letter inclosed extension agreements, and urged the contractor to sign them and to proceed with the work.

On December 26 the company replied in a letter containing a recital of grievances against the engineer, whose acts were alleged to have been so arbitrary as to constitute breaches of the contract. The district was reminded that payment of the November estimate was being withheld, and demand for payment was made, and the letter closed with the statement that the company would postpone a decision of the course to pursue until an answer had been received to that letter from the board.

On January 5, 1920, the board replied, advising that it could not take the company's view about the engineer, and denied any breach of the contract by it, and declined to pay the November estimate without deducting the penalty of $30 per day for delay provided for by the contract. This letter stated the deduction would not be made if an extension agreement was signed on the basis of the one which had just expired. This letter also stated that the contract provided that the board might withhold estimates when, in its opinion, the work was not progressing satisfactorily, and then stated: "In the face of your letter, which seems to indicate that you are considering abandonment of the work, the board would now, more than ever, be unjustified in allowing the November esti-

mate." The letter closed with a request for a confer-
ence to be held on January 12.

On January 11 the company replied that the board's
letter had been turned over to its attorney for reply;
and on January 14 the attorney wrote the board that he
would advise the company to execute the extension agree-
ment, with one change in it, to the effect that "the com-
pany waived no right to assert, in the event of litigation,
a claim for damages resulting from any breach," and
requesting the insertion of this clause in the extension
agreement, and attention was called to the fact that, if
the board had not breached the contract, this amendment
could not hurt.

On January 19, 1920, the attorney for the board
wrote the attorney for the company that the board could
not accept and would not agree to the insertion of the
clause proposed in the extension agreement, and that the
board had instructed the engineer to give the company
notice to resume work under section 16 of the specifica-
tions contained in the contract.

This section provides that, in case of any unneces-
sary or inexcusable delay in the general conduct of the
work, or in the event of an actual or practical abandon-
ment of the work, the engineer will notify the contractor
and his bondsmen to that effect. If, after this notice,
the contractor or his surety does not, within ten days,
take such measures as will, in the judgment of the board,
insure the satisfactory completion of the work, the engi-
neer may, with the consent of the board, notify the con-
tractor to discontinue work. This section further pro-
vides: "The engineer shall thereupon have power, under
the direction of the board, to place such and so many
other persons as he may deem advisable, by contract or
otherwise, to complete the work herein described, and to
use such materials and equipment as he may find upon
the line of said work; all expense of such completion of
the work, including the additional amount to be paid to
the persons completing same, the claim of the engineer

for services for overtime, and the compensation of the inspectors and any other claim arising under this contract, shall be deducted and paid by the parties of the first part out of any such moneys as may then be due the said contractor, or which may thereafter become due, under and by virtue of this agreement or any part thereof, and in case any such expense is less than the sum which would have been payable for such work under the contract, if the same had been completed by the party of the second part, the contractor shall be entitled to receive the difference. If the expense is greater, then the bondsmen or surety will be called upon to make good the difference."

On the day on which this letter was written, the board adopted a resolution that "the Burke Construction Company and its bondsmen be notified that work in this district must be resumed within ten days, or else the work would be taken over by the board." On January 22 the company wrote the board in regard to the notice of the 19th, and stated that it had not abandoned the work and did not intend to do so, but, as the engineer required the work to be bone-dry before proceeding, and that, inasmuch as more or less rains would occur within the next ninety days, the work would be suspended for that time. This letter stated that the board had violated the contract in many respects, and was still violating it, and had no right to take the steps indicated in the letter of the 19th.

In reply to this letter, the attorney for the board stated that the board had not satisfactory evidence of the purpose of the company to resume work, and called attention to the fact that the extension agreement had not been signed, and that from the circumstances the board could draw no conclusion except that the company was in fact abandoning the work, and advised that the board was unwilling to withdraw the notice of the engineer dated January 19th.

On January 31st the engineer made a report to the board, advising that he had received no reply to his notices sent the company and the sureties under section 16 of the specifications, and stating that he had no evidence whether the company intended to respect that notice, and in this report he recommended that the engineer be authorized to employ such help and provide such organization as was necessary, that the rough grading be let to a responsible person, and that the board take over all equipment and material belonging to the company to facilitate its performance, and that, in making these recommendations, he had considered the option reserved by the board to relet the work remaining to be done.

On February 9 the board had a meeting, at which a resolution was adopted reciting the notice of January 19, and the failure of the company to resume work, and it was resolved that the company's contract be terminated and that the company cease to have further possession of the work or any connection therewith, and that "the engineer be and he is hereby instructed to take over and to take charge of said work, and to so notify the Burke Construction Company, and also further to take charge of such machinery, tools, equipment, and materials as he may find along the line of said work," and that the bonding company, as surety, be offered the opportunity to take over the work under the terms of the contract. The board, at that meeting, ordered the engineer to be placed in charge of the work and all of the machinery, tools, materials, and equipment on the line of the work, in accordance with section 16 of the specifications, and that the engineer notify the company to get off the work.

On February 9, pursuant to the instructions of the board given at its meeting on that date, the attorney for the district wrote the surety company and inclosed a copy of the minutes of the meeting, and advised that the district had taken over the company's equipment and would hold the same as provided in section 16 of the

specifications, and requested the surety company to take over the work. On the same day the engineer notified the company that, in accordance with the resolutions of the board, he was notifying it to discontinue all work, "it being the intention of the board henceforth to continue with the work under the terms of section 16 of the specifications," a copy of the resolutions being inclosed in the letter.

On February 26, 1920, the surety company wrote the board declining to take over the work in the district, and advised that the company contended that the district had broken the contract.

The engineer made an inventory of the equipment which he found on the job belonging to the company, and he filed a copy thereof with a report which he made to the board at its meeting on February 16. This report was approved, and a copy of the inventory was ordered forwarded to the company. After taking over the company's equipment, the district held all of it until May 20, at which time it released a grader and a tractor, and retained possession of the remainder until June 19, at which time the district notified the company that it had no use for the equipment, and the same was tendered to and accepted by the company.

After this correspondence began, a conference was arranged to be held on February 16 between the board and the company to attempt an adjustment of their differences, but no representative of the company attended, and the meeting was not held. Upon the contrary, the company, on that date, filed suit in the Federal court against the district and the members of the board individually for breach of contract, and prayed judgment for $114,331.60 damages. Thereafter, on March 20, the board brought this suit against the company and its sureties in the chancery court, and prayed judgment for the difference between the contract price of the unfinished work and the cost of finishing it. On motion of the company, this cause was removed to the Federal court, where, upon

the motion of the district, it was remanded to the chancery court of Miller County, where it had originated.

The company filed a bill in equity on August 24, 1920, in the Federal Court for the Western District of Arkansas, to enjoin the board from proceeding with the prosecution of this suit, on the alleged ground that it was an interference with the jurisdiction of the Federal court. The relief prayed was denied by the district judge, whereupon the company prayed an appeal to the Court of Appeals of this circuit, and that court reversed the decree of the district-court and granted an injunction as prayed. The case was then taken to the Supreme Court of the United States on certiorari, and the decision of the Court of Appeals was reversed. Thereafter the parties proceeded with the prosecution of this litigation.

The complaint filed by the district alleged that, under the terms of section 16 of the specifications, the district was authorized to, and did, take over the equipment belonging to the company, and that the property was then in its hands, and was being held and preserved by the board for use in finishing up the work, and a list of the property taken over was made "Exhibit D" to the complaint. There was a prayer "that proper disposition be made of said property that plaintiff had taken over under the contract, that the plaintiff be authorized to retain and use said equipment," and that judgment be rendered in its favor for $80,000 damages for breach of contract.

Many motions and pleadings were filed in the cause, and a vast amount of testimony was taken, and, on final hearing, a decree was rendered in favor of the district for the sum of $60,833.14, and both the company and the sureties and the district have appealed.

One of the preliminary questions raised and very earnestly insisted upon is that the suit was prematurely brought. The company denies that it has in any manner breached the contract, but insists that, even though the

fact be otherwise, the district has elected to proceed under section 16 of the specifications, and, having so elected, the rights and liabilities of the parties must be determined by that section, and that, inasmuch as the district took over the work for the purpose of completing it, the district must first finish the work, either by letting a new contract therefor or by doing the work itself under the direction of its engineer, and, after finishing the work by one method or the other, then demanding that the company pay the difference, if any, between the cost price and contract price, if there is an excess, or, on the other hand, paying to it the difference between the cost price and contract price if there was a saving.

It is apparent, from a reading of section 16, set out above, that, if the company had breached the contract by failing to proceed with the work, the district had the right to take it over and complete it, and, as a means to that end, was authorized to take over the company's equipment, and, having done so, the district had the right to complete the work itself, or to let new contracts therefor, and in either event to hold the company and its sureties for any excess of cost over the contract price, with the reciprocal obligation of accounting to the company for any saving accomplished if the work was completed at a cost less than the contract price.

In the case of *Perdue & Hill* v. *Road Imp. Dist. No. 1,* 159 Ark. 117, the district exercised the right to take over the work and relet a contract to complete an unfinished improvement; and we held the district should account to the contractor for the difference which there existed between the cost under the new contract and the original contract price.

It is the opinion of Mr. Justice HUMPHREYS that the effect of that case is to require a district, operating under a contract like the one here involved, to take over the work and complete it, in the event the contractor fails and refuses to complete the work, and, after having been

given this right, it is the remedy which the district must pursue, and is its exclusive remedy.

The majority do not so construe the case cited. That opinion must be interpreted in the light of the facts there stated. There was, in that case, no question of the options of the district or its right of election of the remedies it would pursue. Section 61 of the contract in that case gave the district the same right to take over the work as is here given by section 16, and the district there had elected to exercise that right, and, pursuant to that election, had completed the improvement. No question was presented as to whether the district was compelled to complete the work. The fact was that the district had done so, and the question presented was, what were the rights of the parties under the case made? The parties had in fact proceeded under the section of the contract which gave the district the right to take over and complete the work, and, having done so, it became necessary to determine the rights of the parties under those circumstances. In other words, section 61 was the contract in that case, because the district had proceeded under it, and that section became therefore the relevant and governing section. As we there said, section 61 could be applied in the event only that the district had taken over the work upon a failure of the contractors to complete it. In other words, the question there presented was not whether the district was required to proceed under section 61, for it had already done so, and, having done so, the only question was, what were the respective rights and obligations of the parties under the section under which the district had acted?

The majority there said it was somewhat anomalous that one's rights could be controlled by a contract which he had breached, but that such was the law of that case, because the parties had provided by the contract what the respective rights and liabilities of the parties should be in the event the contractor failed to complete the improvement and the district took it over and com-

pleted it, which was the state of that case. The Chief Justice dissented upon the grounds, however, that, having breached the contract, as the majority found, the contractor could predicate no right upon the contract.

It is the opinion of the majority that the district was not required to proceed under section 16. That was a mere option which the contract gave it, and, if there was no election to exercise that option, it might pursue the ordinary common-law remedies available to a contracting party whose contract has been breached.

It is the view of the writer that, while the opinion in the case of *Perdue & Hill* v. *District, supra*, has no application here, this suit was prematurely brought, because the district is shown to have made its election to proceed under section 16, and, having elected, the election is irrevocable, and the district should therefore have completed the improvement, as was done by the district in the Perdue & Hill case, and thereafter called the contractor and his surety to an accounting in the manner provided by that section.

It is the opinion of the majority, however, that the district made no such election as to be bound thereby. The views of the majority are as follows: It was the duty of the district to advise the surety that the contractor was not proceeding with the work, if a breach on that account was being claimed. The district did take charge of the equipment; but this was done to compel performance by the contractor and his surety, and, after taking over the equipment, the district demanded that the surety complete the work, and insisted that this be done. The district made no use of the equipment so far as attempting to complete the work was concerned, and, in fact, did no work towards the completion of the contract, the only work done by the district being directed to putting the streets, which had been torn up and rendered impassable by the company, in condition so that the public could use them. The company made no demand for any of its equipment except the grader and the

tractor, and these were turned over to the company on demand, and the remainder of the equipment was voluntarily turned back to the company. Moreover, the suits brought in the Federal court against the district and the members of the board individually for damages, and the one for injunction, operated to prevent the election to proceed under section 16 from becoming effective, had the board sought to make it final, as the company thereby expressed, in the most emphatic and effective manner possible, its refusal to acquiesce in the district proceeding to the completion of the work, and the district thereafter did nothing except to wait on the company to complete the work and sue for the damages for a failure to do so.

Another preliminary question which is pressed with equal earnestness is that the chancery court was without jurisdiction to try this case, it being insisted that the suit, in effect and in fact, is an ordinary suit for unliquidated damages. In support of the court's jurisdiction, it is insisted by the district that the case is one involving intricate accounts, and, further, that the company has waived the right to question the jurisdiction of the chancery court.

As we have concluded that the district is right on the first proposition, we do not stop to consider whether it is also right on the second.

The transactions covered by the testimony in this case extended over a period of three years, and the contract out of which the litigation arose covered a large part of the city of Texarkana. It was alleged in the complaint of the district that little more than one-half of the proposed improvement was completed and a considerable amount left in an unfinished condition. The contractor claimed about $85,000 for sundry items of extra work and material, for improperly rejected curbs and gutters, for unnecessary moves, loss of time of men and teams and material. There is a conflict with reference to the kind and character of the work and the

material to be used and the material which was used. It was apparent from the allegations of the pleadings that much testimony would be required, and much was offered on the disputed values, measurements and estimates, and in our own attempt to review these controverted items it appears that the case is one which involved long and tedious accounts. The case on this question is not unlike that of *Seitz* v. *Meriwether,* 119 Ark. 271, except that many more items are here involved than were in contro-versy in that case. That case involved many disputed items which had first to be passed upon before stating the account, and we there said: "In such cases the chancellor has power to appoint a master trained in the work to examine the accounts, to take testimony in reference thereto, and to direct him to report his finding to the court. The chancellor then has authority to consider and modify the report of the master, after exceptions thereto have been made. All these are cogent reasons why the accounts could be better settled by the machinery of a court of equity than by a jury. The jurisdiction of a court of chancery to settle and adjust long and complicated accounts, such as appear from the record in this case, is well established by former decisions of this court. *Trapnall* v. *Hill,* 31 Ark. 345; *Smith* v. *Stack,* 89 Ark. 143; *Bagnell Tie & Timber Co.* v. *Goodrich,* 82 Ark. 547; *Goodrum* v. *Merchants' & Planters' Bank,* 102 Ark. 326.''

Another question raised by the company, which may be disposed of at this point in the opinion, is the insistence that the testimony shows that the district could not have performed its part of the contract by making payments had the company completed the work, and that the district is therefore in no position to complain of the company's failure to perform the contract. A complete answer to this point appears to be that no such question is raised by the pleadings or was presented to the court below. It may be that the cash which the district had on hand would not have paid the balance which would have been due the company had the work been completed; but

there is no showing that the district could not have met its obligations, as it does not appear that the sum raised by the district equaled the betterments which had been assessed, and more money might have been raised by the sale of additional bonds or otherwise, and there might have been, if necessary, a reassessment of the portion of the betterments to be collected which would have produced enough money to meet the district's obligations to the company without exceeding the total assessment of benefits.

The court found the fact to be that the company, and not the district, breached the contract. The company complains bitterly of the conduct of the engineer, and insists that in many respects the engineer's conduct was so arbitrary and unreasonable as to constitute breaches of the contract. But most of these complaints occurred in the first year of the contract, and others were in the second, and we think the extensions of the contract and the continued operations thereunder waived these breaches, if any there were. *Lewelling & Price-Williams v. St. Francis Road Imp. Dist.,* 158 Ark. 91; *Brown & Froley v. Monroe County Road Imp. Dist.,* 153 Ark. 606.

We concur in the court's finding that it was the company, and not the district, which breached the contract. The failure to complete the contract within a year was itself a breach of the contract. It is true the district waived the breach by the extension, and it also waived the breach to finish the work in the time covered by the second extension; but the company did not complete the work within that time, and this was a breach. The company was urged to sign an extension agreement, but this it refused to do except upon conditions which, we think, it had no right to impose.

It is true the district withheld the November estimate, which was payable in December; but section 25 of the contract gave the district the right so to do if, in the opinion of the board, the work was not progressing in accordance with the provisions of the contract; and the

contractor here had suspended work and had refused to resume it. The contractor did finally offer to execute an extension agreement, but, as we have said, he offered to do this only under conditions which he had no right to impose.

Having reached the conclusion that the company had breached the contract, and that the rights of the parties were not determined by section 16 of the specifications, it becomes necessary to measure the damages, and this is done by ascertaining the cost to complete the work in accordance with the specifications in excess of the contract price.

Upon this subject there is a vast amount of testimony, covering many items, which we have carefully considered, but which we do not undertake to review because of its very volume, and a review of the testimony would not serve as a precedent in any other case. An itemized statement of the portions of the work remaining uncompleted was prepared by Petersen, and this estimate of the cost of completion was $87,000 in excess of the balance which would have been due the company had it completed the work. The district employed two engineers, who were men of established reputation, who had no connection with the case except to make an estimate of the cost of completion in excess of the contract price. These engineers made separate estimates, after a consideration of all the items involved. Tillson, one of these engineers, placed the excess at $80,833.14, and Miller, the other, placed the excess at $89,538.39. This excess over the contract price was shown to have resulted in a large measure from the increased cost of labor and material.

Witnesses Taylor and Gregory, who were also engineers, testified in behalf of the company, and one placed this excess at $18,767.14, and the other at $23,809.36.

The court accepted as substantially correct the figures of Tillson, and based its finding thereon; and we have concluded that action is not clearly against the

preponderance of the evidence except in the particulars hereinafter stated.

Tillson's estimate appears to have been based upon Petersen's estimate of the work completed. It was, of course, necessary to know what percentage of the work had been finished to ascertain what the cost of completion would be. Petersen made an elaborate statement covering that question. The district employed Ayres, an engineer, to check up the completed work which was covered by the estimates which had been given the contractor each month as the work progressed. Ayres made an estimate and measurement of a number of the disputed items, and, according to his testimony, the estimates given the company from time to time by Petersen lacked $3,677.12 of covering all the work which they had done. The district practically concedes that Ayres' figures are correct, except that it contends that Ayres included in his calculation work which Petersen had refused to accept as defective. It appears, however, that in the second paragraph of an amendment to the complaint of the district it was specifically alleged that various items of the work had been defectively done, and credit on that account should not be allowed. The court, in its decree, specifically found against the district on this allegation, and we do not think this finding is clearly against the preponderance of the testimony.

We think therefore that Ayres' figures should be accepted as correct; and, if this is done, it follows that the company should have credit for this unestimated work, and the decree of the court below must be so modified as to allow it. In addition to all the other controverted items the company claimed certain credits aggregating $23,372.51. The principal items embraced in this claim were for the reserved percentage and the unestimated work embraced in Ayres' measurements and a few small items which do not appear to be disputed. The court allowed the contractor a credit on account of these items amounting to $20,000. It is not made

plain how this amount was arrived at, and, if Ayres' measurements are taken as correct, it appears to us the court should have allowed the credit of $23,372.51 as claimed, instead of the credit of $20,000. The decree against the company and its sureties should therefore be reduced by the difference between these amounts, which is of course $3,372.51.

On behalf of the surety company it is insisted that, whatever the liability of the company may be, its own liability has been discharged because of the unauthorized changes which were made in the contract during the progress of the work. Of this contention but little need be said. We think the changes which were made were either authorized by the contract, or that the right to complain because of them was waived by the extension agreements which were executed with the consent of the surety, for, as we have said, these changes occurred either during the first or second year of the contract, and were therefore waived either by the first extension agreement or by the second one.

There is a cross-appeal by the district, in which we are asked to reverse the findings of the court below on items covering work rejected by Petersen as defective and for relaying the same. But we have said that the court's finding on these items was not clearly against the preponderance of the evidence.

The district also insists, on the cross-appeal, that interest should be allowed on the cost of completing the improvement in excess of the contract price from the date of the breach of the contract by the company to the date of the judgment, amounting to $10,958.74. We do not think so, as the delay in completing the work has resulted from the district's own volition in not proceeding with it sooner, as it might have done, and the district has not in fact expended the money upon which it is asking interest.

The district also asks, on the cross-appeal, for liquidated damages from the date when the work should

have been completed to February 9, 1920, when the work was taken over by the board. We do not think so, because, in its decree, the court has rendered judgment in favor of the district for the damages which it was shown to have sustained.

It follows from the views here expressed that there was no error in the decree except in failing to allow the company credit for work done in accordance with Ayres' estimate, and the decree will therefore be modified in this respect, and, as thus modified, affirmed.

HUMPHREYS, J., dissents.