**THIRD DIVISION**
**ANDREWS, P. J.,**
**DILLARD and MCMILLIAN, JJ.**

**NOTICE:** Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**November 19, 2013**

# In the Court of Appeals of Georgia

A13A1586. HOPE ELECTRIC ENTERPRISES, INC. v.
SCHINDLER ELEVATOR CORP.

MCMILLIAN, Judge.

Plaintiff/appellant Hope Electric Enterprises, Inc. ("Hope Electric") appeals from the trial court's order granting partial summary judgment to defendant/appellee Schindler Elevator Corporation ("Schindler") on Hope Electric's claim for wrongful termination of the parties' contract. For the reasons set forth below, we now reverse.

The record shows that in October 2007, Schindler entered into a contract with the Metropolitan Atlanta Rapid Transit Authority ("MARTA") to act as the general contractor on a project to rehabilitate escalators in MARTA stations throughout the Atlanta area (the "Prime Contract"). In June 2008, Schindler subcontracted with Hope

Electric to perform certain electrical work for a portion of the project ("Subcontract"), and Hope Electric began working on the project later that year.

Hope Electric apparently worked on the project without any documented incidents until April 2010. On April 16, 2010, MARTA issued a Construction Safety Inspection Report citing Hope Electric for leaving an electrical closet door open on a train platform ("Violation 1"). According to the report of Violation 1, there were "no men [Hope personnel] at location" and the corrective action taken at that time included providing the "Station Manager" safety cones to protect the wires on the floor and barricades to protect the doorway. Further, the report indicated that verbal instructions were given not to leave the door open. And, according to a letter sent to Hope Electric on August 27, 2010, Schindler's safety officer at the site conducted a safety review following the violation.

A few weeks later, on April 28, 2010, MARTA cited Hope Electric for removing a breaker from a live breaker panel without any MARTA personnel present ("Violation 2"). According to the report of Violation 2, Hope Electric was reprimanded at a progress meeting for this violation.

On August 9, 2010, a MARTA train operator whose train was stopped in the Georgia State station observed Hope Electric principal, Willie Hope Jr., and another

Hope Electric employee, James Reid, crossing "live" MARTA train tracks during normal operating hours ("Wayside Violation"). The report of the Wayside Violation also indicates that Willie Hope did not have proper MARTA identification on his person and that he became belligerent when questioned by MARTA police who came to the site. Willie Hope admitted in a meeting later that day with MARTA personnel and Mark Lester, Schindler's project manager, that his access to this live track area was unauthorized, but refused to acknowledge that he had committed a safety violation.

During the meeting, MARTA revoked Hope Electric's access to the project sites and Schindler directed Hope Electric to cease all further work on the project until MARTA concluded its investigation. On August 27, 2010, Schindler sent a letter to Hope Electric stating that Schindler had discovered that electrical components at the Georgia Dome Station were falling off the wall, apparently because they were not properly anchored. The letter also stated that this violation had been discovered since the Wayside Violation and referenced the other violations. The letter further notified Hope Electric that "[t]hese repeated problems are unacceptable" and directed that it repair the Georgia Dome Station problems. However, the letter also reiterated that Hope Electric could not perform any work on the project, including repairing the

Georgia Dome Station components, until MARTA completed its investigation and determined the "required corrective action" for the Wayside Violation.

On August 30, 2010, MARTA sent a letter to Lester directing Schindler to immediately remove Hope Electric from the project based on the "severity of th[e] recent [Wayside] infraction, coupled with the previous incidents[.]" On September 10, 2010, Schindler provided Hope Electric a copy of the August 30 MARTA letter. On September 20, 2010, Schindler sent a letter notifying Hope Electric of the immediate termination of the Subcontract. The letter also stated that Schindler had "no choice" but to terminate the Subcontract based on MARTA's August 30 letter.

Hope Electric subsequently filed a complaint against Schindler, alleging Schindler breached the Subcontract by, among other things, wrongfully terminating the Subcontract. Schindler moved for partial summary judgment on this claim, and the trial court granted Schindler's motion. Hope Electric timely filed the present appeal challenging that order. We agree with Hope Electric that the trial court erred by granting summary judgment to Schindler on the wrongful termination claim.

1. We turn first to the provisions of the Prime Contract and Subcontract which are relevant to our analysis.[1] The primary provision of the Subcontract at issue here is Section 7.2.1, which provides as follows:

> If the Subcontractor repeatedly fails or neglects to carry out the Work in accordance with the Subcontract Documents or otherwise to perform in accordance with this Subcontract and fails within a ten-day period after receipt of written notice to commence and continue correction of such default or neglect with diligence and promptness, the Contractor may, by written notice to the Subcontractor and without prejudice to any other remedy the Contractor may have, terminate the Subcontract and finish the Subcontractor's Work by whatever method the Contractor may deem expedient. . . ."

And Hope Electric had a specific duty to perform its work safely under Section 4.3.1 of the Subcontract.[2]

Schindler argues that these provisions authorized the termination of the Subcontract based on the "overwhelming evidence of four safety violations in five

---

[1] The provisions of the Prime Contract were made part of the Subcontract in Article 1, § 1.1 of the Subcontract.

[2] That section provided that Hope Electric "shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by the Contractor and with applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities for the safety of persons and property in accordance with the requirements of the Prime Contract."

months time," including the "very serious Wayside Violation."[3] On the other hand, Hope Electric argues that a jury must decide whether it "repeatedly fail[ed] or neglect[ed] to carry out the Work in accordance with the Subcontract[;]" whether it "fail[ed] within a ten-day period after receipt of written notice to commence and continue correction of such default or neglect with diligence and promptness[;]" and whether its denial of access to the project site prevented it from taking any action to address the alleged deficiencies in its work. We agree with Hope Electric that a jury must decide these issues.

We start with the pivotal issue, which is whether Hope Electric "repeatedly" failed or neglected to carry out the work or perform in accordance with the Subcontract. "Repeatedly" is not defined or otherwise limited in the Subcontract, and there is nothing to indicate the parties did not intend for it to be given its "usual and common signification." OCGA § 13-2-2 (2). And in such cases, we often find it useful to turn to a dictionary to supply the plain and ordinary meaning of a word. *Harkins v. CA 14th Investors*, 247 Ga. App. 549, 550 (544 SE2d 744) (2001).

---

[3] Although we are mindful that Schindler had been placed in a difficult position because it had been directed by MARTA to terminate Hope Electric, Schindler does not assert that there was anything in the Prime Contract or Subcontract that authorized Schindler to terminate the Subcontract merely because MARTA directed Schindler to do so.

According to the American Heritage Dictionary, http://ahdictionary.com/word/search notes, "repeatedly" is an adverb meaning "said, done, or occurring again and again." However, this definition does not aid us much, as even a word of common understanding and usage may be ambiguous depending on the context in which it is used. See *Archer Western Contractors, Ltd. v. Pitts*, 292 Ga. 219, 225-226 (2) (735 SE2d 772) (2012). An ambiguity results when there is "duplicity, indistinctness, an uncertainty of meaning or expression used in a written instrument, and it also signifies being open to various interpretations." (Citation and punctuation omitted.) *McGuire Holdings, LLLP v. TSQ Partners, LLC*, 290 Ga. App. 595, 602 (2) (b) (660 SE2d 397) (2008). E.g., *Freund v. Warren,* 320 Ga. App. 765, 769, n. 4 (740 SE2d 727) (2013).

As used in the Subcontract, we believe that the term "repeatedly" is such an indistinct and uncertain term. The Subcontract provides no reference point to determine what constitutes a "repeated" violation or failure to perform and there is no indication of how many occurrences there must be before the contractor is authorized to terminate the Subcontract pursuant to this provision. And the Subcontract is uncertain concerning what, if any, considerations beyond mere number of violations are relevant to this determination. For example, Schindler suggests that

7

the temporal proximity of the violations should be taken into account and consideration of the total length of time the subcontractor has worked on the project is irrelevant. Thus, Schindler argues that termination of the Subcontract was authorized in this case because four violations occurred within five months of each other. Hope Electric, however, says what is relevant is that it had worked on the project for almost two years before the first violation was documented, and, even assuming that three to four violations have occurred within five months, relatively few violations have occurred over the total time span it has been working on the project. These arguments serve to illustrate the uncertainty of the meaning of the term "repeatedly." And because we cannot resolve this ambiguity by applying the usual rules of statutory construction to ascertain the intent of the parties, a jury must resolve the issue of what the ambiguous language means. E.g., *White v. Kaminsky*, 271 Ga. App. 719, 721 (610 SE2d 542) (2004).

Further, we do not believe that the facts are as clear, much less overwhelming, that there have been four properly documented occurrences over a five-month time period as Schindler's asserts. For example, the Georgia Dome violation, which appears to involve the use of improper anchors, was mentioned for the first time in Schindler's letter to Hope Electric on August 27, 2010, and the letter states only that

8

the problem was *discovered* after the Wayside Violation but does not state when the actual violation occurred. And the Georgia Dome violation appears to relate to a work performance issue, not a safety violation like the other three violations, which also belies Schindler's assertion that termination was authorized by the "overwhelming evidence of *four safety* violations in five months time."[4] (Emphasis supplied.)

Moreover, and pretermitting whether Hope Electric committed three or four violations and pretermitting whether that number of violations constitutes a repeated failure to perform, the Subcontract also appears to require that Hope Electric be given an opportunity to cure any failures or deficiencies in its work before termination of the Subcontract is authorized. Section 7.2.1 plainly states that there must be a repeated failure or neglect by the subcontractor to perform its work *"and* fail[ure] within a ten-day period after receipt of written notice to commence and continue correction of such default or neglect with diligence and promptness[.]" (Emphasis supplied.) Here, as Hope Electric argues, it does not appear that it had notice, written or otherwise, of the Georgia Dome violation until after it had been ordered off the site, and thus it appears without contradiction that Hope Electric was never given an

---

[4] This should not be read to state that the violations must all be of the same character for that is another question that is uncertain and must be answered by a jury.

opportunity to correct this alleged deficiency. Further, the evidence concerning Violation 1 is unclear concerning when Hope Electric was provided notice. The report issued at the time of Violation 1 indicates that no Hope Electric workers were on site, and that the *station manager* was given barriers and told not to leave the door open. And although the August 27, 2010 letter to Hope Electric stated that "a safety review was conducted by Schindler's Safety Officer on site following this violation," the letter does not state with whom the safety review was conducted.

But Schindler argues that under the "doctrine of futility," it was not required to give Hope Electric notice and an opportunity to correct the safety violations because these violations were not curable by corrective measures. Hope Electric counters that, among other reasons, Schindler cannot rely on the doctrine of futility because it did not raise this issue in the trial court. In response to that assertion, Schindler has filed a supplemental brief and provided us with the transcript from the hearing on motion for partial summary judgment, which reveals that it did raise the issue during the hearing. Further, Schindler argues that even though the trial court did not expressly mention the futility doctrine in its summary judgment order, it is nevertheless appropriate for us to affirm the trial court's order under the "right for any reason" rule.

10

As our Supreme Court recently explained "'(A) grant of summary judgment must be affirmed if it is right for any reason, whether stated or unstated in the trial court's order, *so long as the movant raised the issue in the trial court and the nonmovant had a fair opportunity to respond.' Anderson v. Jones*, 322 Ga. App. ___, ___ n. 2 (745 SE2d 787) [] (2013)." (Emphasis in original.) *Georgia-Pacific, LLC v. Fields*, 293 Ga. 499, 504 (2) (748 SE2d 407) (2013). In this case, however, we need not decide whether this argument is properly before us because a jury must decide whether there have been repeated violations of the Subcontract before this issue is reached. We do reiterate, however, that unlike the safety violations, the Georgia Dome violation appears to involve a work performance issue, which Hope Electric possibly could have corrected had it been given a chance.[5] Thus, it would appear that even accepting Schindler's premise, the futility doctrine would not apply to that violation. Additionally, even a safety violation could be corrected in the sense that it not be repeated in the future.

In sum, a jury must decide whether Hope Electric repeatedly failed or neglected to perform in accordance with the Subcontract. If a jury determines that there were

[5] Indeed, Schindler's August 27, 2010 letter to Hope Electric states that once MARTA determined its course of action for the Wayside Violation, Hope Electric "must repair the problems at the above referenced unit, Dome #3, immediately."

11

repeated failures to perform, then it must also decide whether Schindler was required to give, or did in fact provide, notice and an opportunity to correct the alleged violations.

2. We also consider whether termination was authorized by Part 1.05C, Section 01048 of the Prime Contract, which was cited by MARTA in its letter directing Schindler to remove Hope Electric from the project. That section provides:

> Contractor's personnel shall not walk across revenue track during revenue hours. Accomplish work within the limits of the Authority's operating rail system in accordance with the WAYSIDE ACCESS PROCEDURE, Appendix A of this Section. Unauthorized entry by Contractor personnel into the Authority's operating rail system having energized third rail and operating track (which are under WAYSIDE ACCESS control) shall be cause for those personnel to be permanently dismissed from the Project. Contractor personnel working within limits of the Authority's operating rail system shall have an Authority contractor's identification badge and safety badge prominently displayed on their person.

On its face, this provision bars only "those personnel" who commit a Wayside Violation from the project and provides no basis to dismiss or terminate the contractor or subcontractor who employs them. And although one of the offending workers in this case was Hope Electric principal Willie Hope, Jr., Hope Electric

12

submitted an affidavit specifically stating that it has other employees who were qualified to work on the project. Accordingly, termination of the Subcontract was not authorized by this provision, and the trial court's grant of partial summary judgment to Schindler cannot be upheld on this basis.

*Judgment reversed. Andrews, P. J., and Dillard, J., concur.*