# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
September 22, 2016 Session

## M & M ELECTRICAL CONTRACTOR, INC. v. CUMBERLAND ELECTRIC MEMBERSHIP CORPORATION

Direct Appeal from the Chancery Court for Montgomery County
No. MC-CH-CV-CD-1432     Laurence M. McMillan, Jr., Chancellor

No. M2016-00358-COA-R3-CV – Filed November 4, 2016

This appeal involves the termination of a contract between an electric power distributor and an independent contractor. After a bench trial, the trial court concluded that the electric power distributor was justified in terminating the contract because the independent contractor materially breached the contract by violating a safety policy and an oral directive from the power distributor. The independent contractor appeals, claiming that the evidence did not support a finding that it violated the safety policy or directive, that such a violation, even if it did occur, did not constitute a material breach of the contract, and that the power distributor was required to give notice and an opportunity to cure any default prior to terminating the contract. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which ANDY D. BENNETT, J., and J. STEVEN STAFFORD, P.J., W.S., joined.

David Key Taylor and Bridget Brodbeck Parkes, Nashville, Tennessee, for the appellant, M & M Electrical Contractor, Inc.

Roger Alan Maness, Clarksville, Tennessee, for the appellee, Cumberland Electric Membership Corporation.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Cumberland Electric Membership Corporation ("Cumberland") is an electric power distributor serving a five-county area in northern Middle Tennessee and

headquartered in Clarksville. Cumberland has approximately 36 line crews of its own employees, who perform mostly service-related work on its system. Cumberland has historically used independent contractors for system improvements. In 2013, Cumberland entered into a three-year construction contract with M&M Electrical Contractor, Inc. ("M&M") for distribution line construction work on Cumberland's system between July 1, 2013, and June 30, 2016. The contract required M&M to assemble and utilize four crews, each consisting of five crewmembers. These crews would perform work orders for various projects to be completed during the term of the contract. M&M began working for Cumberland on July 1, 2013, and worked for several months without serious incident.[1]

The series of events that led to M&M's termination began on April 16, 2014. M&M had received a work order for a project located on New Shackle Island Road in Hendersonville. The New Shackle Island project was very dangerous and complex. It involved moving existing electrical lines onto new poles fifty feet away in order to accommodate a construction project by the Tennessee Department of Transportation. The work was to be performed at a busy intersection near a hospital and a school. As was the case for most of M&M's jobs, the electrical wires would be energized throughout the project, meaning the crews would be performing "hot work." The lines at New Shackle Island were especially highly energized. The job required five to six linemen to move the lines in unison while raised in the air with bucket trucks.

Admittedly, from day one of the contract period, M&M's co-owners, Tony and Julia Miller, were aware of Cumberland's safety policy requiring all crews to "ground" bucket trucks (and digger trucks) anytime they were performing hot work.[2] Crews would accomplish grounding by utilizing equipment called "truck grounds" or a "grounding chain." The preferred method was to use truck grounds, which consisted of long copper wires fifty to sixty feet long, with one end clamped to the bucket truck and the other end clamped to the "main line neutral" at the top of the electrical pole. When the use of truck grounds was not feasible, due to the distance between the pole and the bucket truck or other circumstances, crews were permitted to use a grounding chain and screw ground, which involved one end of the wire being clamped to the bucket truck and the other end being clamped to a screw in the ground. The goal of these precautionary measures was to prevent the bucket truck from becoming energized if an electrical wire came in contact with the bucket truck. If the truck became energized, it would electrocute anyone

---

[1]At a January 2014 progress meeting with M&M, Cumberland's representatives raised several concerns about various aspects of M&M's work. However, Cumberland's general manager would later testify that these concerns were not why the contract was ultimately terminated. Accordingly, we will not discuss these issues in detail for purposes of this opinion.

[2]Digger trucks have an auger that digs holes for the utility poles and a crane winch that lifts the poles into the correct position.

touching the truck.

Despite its admitted knowledge of Cumberland's grounding policy, M&M did not use either method to ground any of the six bucket trucks it used at the New Shackle Island project on April 16, 2014. The reason for this was subject to some dispute. According to Tony Miller, co-owner of M&M, he made the decision to forego grounding the bucket trucks because of the number of trucks and men involved in the project and his conclusion that someone could have been killed if one man made a mistake while all the trucks were grounded to the system neutral. Rather than grounding the trucks, he decided to have crew members "watch the trucks," forming "a human barricade," which he claimed was "another acceptable way of watching trucks if you have them ungrounded."[3] According to Tony Miller, he informed Cumberland's system design engineer, Jonathan Fielder, who was on-site, about the decision; however, Fielder had no recollection of the alleged conversation.[4]

According to Fielder, he first noticed that the M&M bucket trucks were not grounded while having a conversation on-site with Cumberland's supervisor of engineers, David Abernathy. Fielder denied having any prior discussion with anyone from M&M about grounding. Fielder approached M&M's safety director, Terry Eden, to inquire about why M&M's trucks were not grounded, and Eden allegedly indicated to Fielder that "they were working on that." Abernathy similarly understood that M&M's grounds were "being worked on." Abernathy believed that M&M's ungrounded trucks were a gross violation of Cumberland's safety policy, but he also recognized the difficulty presented by the situation because M&M's equipment was located in the middle of an intersection. Fielder and Abernathy did not stop M&M's work on the project. However, Abernathy took photographs of the trucks and called Cumberland's safety coordinator, Chip Miller,[5] to come to the site and assess the situation. When Chip Miller arrived, he also had a conversation with M&M's safety director, Terry Eden, and was told that Eden was in the process of making a more secure connection on the bucket trucks for attaching the truck grounds. Chip Miller told Eden that he needed to do something as far as grounding the trucks, even if it was temporary. Eden said that he would take care of it, so Chip Miller said "that was fine" and did not shut down the job.

Regardless of the dispute about the reasoning for the decision, the parties agree

---

[3]According to Cumberland's safety coordinator, OSHA regulations permit barricading when grounding is not possible, but the regulations require actual physical barricades being erected around the truck and do not envision a "human" barricade.

[4]According to Cumberland's general manager, Jim Coode, Fielder would not have had authority to allow M&M to perform energized work without grounding in any event.

[5]Chip Miller, Cumberland's safety coordinator, is not related to Tony and Julia Miller, co-owners of M&M.

that M&M did not ground its six bucket trucks at the New Shackle Island project on April 16. The following day, April 17, Cumberland's manager of the engineering division, Mark Cook, spoke with M&M's president and co-owner Julia Miller by telephone and expressed concern about the fact that he had received a report about M&M bucket trucks on the New Shackle Island project that did not have truck grounds. He asked her to remedy the situation. That same day, various engineers and supervisors at Cumberland also discussed the ungrounded bucket trucks that were observed at the New Shackle Island project. Cumberland's engineers believed that a serious safety concern existed that necessitated an internal meeting to address the course of action that would be required of M&M going forward.

The following day, on April 18, which happened to be Good Friday, an internal meeting was held at Cumberland in response to the grounding issue. Those in attendance included Cumberland's system design engineer for the New Shackle Island project, Jonathan Fielder; supervisor of engineers David Abernathy, who was also on-site and observed the grounding situation with Fielder; safety coordinator Chip Miller, who was called to the site; manager of engineering Mark Cook; and operations manager Randy Holt. Safety coordinator Chip Miller reported that M&M's set up at New Shackle Island was marginal at best as far as getting the work done safely, and he said that he would not allow Cumberland's own crews to use such methods. The group ultimately decided to have Chip Miller, as safety coordinator, call M&M and convey the message that M&M was not to work on Cumberland's system again without the use of grounds on their trucks.

Chip Miller telephoned M&M on the afternoon of Good Friday and spoke with M&M's president and co-owner Julia Miller. By all accounts, the two had a cordial conversation about grounding and the bucket trucks that were observed at the New Shackle Island project on April 16. Despite the cordial tone, however, Chip Miller clearly conveyed to Julia Miller that he was worried about the way that M&M's trucks were set up that day, and he informed her that someone else at Cumberland had also complained about the fact that the trucks were not properly grounded. By the end of the conversation, Julia Miller admittedly understood that she was "to make sure that our trucks were grounded by Monday morning." Specifically, Julia Miller was told to: (a) have all M&M trucks equipped with grounds by Monday morning, and (b) ensure that measures were taken to ground the trucks anytime they were doing hot work. She understood that *all* trucks were to be grounded, not just at New Shackle Island, but wherever they were working on Cumberland's system. There was no doubt in Mrs. Miller's mind that effective Monday, April 21, M&M was not to have any truck working on an energized line if it was not grounded. Tony Miller also understood, from speaking with Julia Miller, that Cumberland was directing M&M not to put another ungrounded truck on an energized line in Cumberland's system. Julia Miller told Chip Miller that she

4

would take care of the issue.

Tony and Julia Miller worked on Easter Sunday to assemble truck grounds for two bucket trucks that M&M had rented, which did not come equipped with truck grounds. However, neither Tony nor Julia Miller contacted M&M's safety director or crew foremen to inform them of the directive from Cumberland, effective the following Monday, to ground the trucks anytime they were doing hot work. Julia Miller explained that she did not feel the need to do so because M&M employed experienced crew foremen who, she believed, always used truck grounds, and they had no prior issues with grounding aside from the project at New Shackle Island. Although Mrs. Miller worked in M&M's office and not in the field with the crews, she was confident that the crews knew to use truck grounds and were consistently using truck grounds when doing hot work.

On Monday, April 21, 2014, Cumberland's engineers visited three work sites where M&M crews were working in order to determine whether they were in compliance with the directive regarding grounding. System design engineer Jonathan Fielder visited the New Shackle Island project and observed that M&M's trucks there were grounded. David Abernathy, Cumberland's supervisor of engineers, inspected two other worksites. According to Abernathy, at the first worksite, headed by M&M crew foreman Joe Phelps, he observed an M&M crew changing out a pole with energized lines, and none of three trucks being used on the job were grounded. According to Abernathy, he told the M&M crew foreman that the crew could not continue the work until they grounded the trucks. Abernathy then went to a third worksite, under the direction of M&M crew foreman Earl Fuqua. Abernathy observed this M&M crew completing a pole replacement, which involved energized lines, using two trucks that were not grounded. Abernathy again relayed the message that they could not perform any energized work without truck grounds.

After observing these two crews, Abernathy instructed Cumberland's project engineers to check the M&M crews they oversaw and ensure that they were following Cumberland's safety policies. Abernathy also reported his findings to Cumberland's manager of engineering, Mark Cook. Cook relayed the information to Cumberland's general manager, Jim Coode. Within one to two days, another internal meeting was held at Cumberland to determine how to handle the situation. General manager Coode ultimately concluded that M&M's contract should be terminated due to safety concerns. Cumberland's board of directors had a meeting on Friday, April 25. Coode presented the information to the board at that meeting, and the board approved Coode's request to seek legal counsel and terminate the contract with M&M. On or about April 30, Tony and Julia Miller were called to a meeting at Cumberland's office, where they were presented with a letter terminating M&M's contract based on documented safety violations. M&M worked to complete some open work orders, and Cumberland paid M&M for all work

orders that were completed during the contract period.

On July 2, 2014, M&M filed a complaint against Cumberland in the chancery court of Montgomery County alleging breach of contract and violation of the duty of good faith and fair dealing. M&M asserted that the stated reason for its termination was factually untrue and that it did not materially breach the contract in a manner that would justify termination. M&M also asserted that Cumberland had a duty to provide M&M with written notice of any default and an opportunity to cure the stated reasons for termination. M&M alleged that Cumberland was contractually liable for the profit M&M would have earned under the remainder of the three-year contract had it not been improperly terminated.

A bench trial was held over the course of three days in September 2015. The trial judge heard testimony from eleven witnesses. M&M conceded that it was aware, from day one, of Cumberland's grounding policy requiring bucket trucks to be grounded to the main line neutral when working on energized lines. It admitted that its six bucket trucks at the New Shackle Island project on April 16 were not grounded. M&M acknowledged receiving the Good Friday telephone call from Cumberland's safety coordinator, directing M&M to have grounding equipment on all trucks and to utilize that equipment anytime it worked on Cumberland's system by the following Monday, April 21. However, M&M disputed whether its crews actually performed any "hot work" with ungrounded trucks on April 21.

The trial judge heard testimony from Joe Phelps, one of the M&M crew foremen who was allegedly caught performing ungrounded hot work on Monday, April 21. Phelps denied performing any hot work while the trucks were ungrounded. He claimed that his crew had started working on the project at issue the previous workday, and they had to stop because of a sudden rain shower. He said they left their equipment and material up on the lines until the following workday and covered the bucket on the bucket truck due to the rain. Phelps claimed that when they returned to the site the following Monday, April 21, they discovered that the bucket cover had a hole in it, and it was filled with rainwater. Phelps claimed that he raised the bucket in the air simply to drain out the rainwater. He acknowledged that the bucket truck was in use and that Abernathy and another engineer visited the worksite, but he claimed that the crew was not actually performing any hot work at that time. However, Phelps did recall saying that he had forgotten to ground the trucks. He acknowledged being told not to do any work until he had proper grounds for the trucks. He said the crew grounded the trucks thereafter and then replaced the pole.

David Abernathy, Cumberland's supervisor of engineers who visited the site, testified to the contrary. Abernathy testified that when he arrived at the jobsite with

Phelps's crew, they were replacing a pole using three trucks – two bucket trucks and one digger – with none of them grounded. He testified that both bucket trucks had the buckets extended, and people were in the buckets doing energized work. Abernathy said he told Phelps that M&M had been instructed not to perform energized work with ungrounded trucks, and Phelps said he forgot. According to Abernathy, Phelps had to call M&M's safety director and ask him to bring grounds to the worksite.[6] Abernathy called one of Cumberland's project engineers who was working nearby and asked him to come to the worksite. When he arrived, Abernathy went to observe M&M's other crew working several miles away.

The second crew foreman who was allegedly caught performing ungrounded hot work, Earl Fuqua, was not called to testify at trial. Abernathy testified that when he arrived at this worksite, the M&M crew was completing the process of "changing out a hot pole." He explained that the crew had finished replacing the pole, and the bucket was coming down from the pole while he was at the site. Abernathy conceded that he did not actually see any hot work being performed "with [his] own eyes" because the pole change was completed before he arrived. However, he said that he observed the equipment when the bucket was still in the process of coming down, and neither the bucket truck nor the digger truck was grounded. Abernathy recalled that M&M's digger truck was malfunctioning, and the driver was using an elbow to operate the joystick while using his hand to wiggle wires under the controls in an attempt to get it to operate correctly. Abernathy testified that he told the crew foreman, Fuqua, not to do any energized work without truck grounds and not to use that particular truck on any energized poles. Abernathy said that in his mind, M&M had committed safety violations at both site locations. He believed the crews were impacting the safety of M&M employees, other people in the field, and potentially the general public.

M&M's own safety director, Terry Eden, also testified at trial. He became employed by M&M just one month prior to the April 2014 events that led to M&M's termination. Eden testified that as of March 2014, when he was hired, M&M did not have all of its trucks equipped with grounds. Eden testified that he began the process of placing grounds on all of the trucks when he was hired, but he said he had not completed that process before the contract was terminated. He acknowledged that on Monday, April 21, not all of M&M's trucks were equipped with grounds, although he noted that crew foremen could always ask for grounds if they needed them. He conceded that when he visited M&M crews on worksites, he sometimes had to remind them to ground the trucks, and he acknowledged his deposition testimony that he "constantly" had to remind them. However, he did not recall any incident when M&M crews had actually performed hot

---

[6]At trial, Tony Miller acknowledged testifying during his deposition that he had received a call from Joe Phelps informing him that "David Abernathy had been out there and that he was a ground short – his bucket. He couldn't find the ground on it."

7

work without grounding.

On January 12, 2016, the trial court entered a final order setting forth detailed findings of fact and conclusions of law. The trial court credited Abernathy's testimony about the events he observed on Monday, April 21, 2014. The trial court concluded that M&M's failure to properly ground its trucks on April 21 constituted a clear violation of Cumberland's safety policy and a clear violation of the directive issued by Cumberland to M&M on Good Friday, April 18, 2014. The court concluded that M&M's failure to follow the safety policy constituted a material breach of the contract. The court also concluded that Cumberland was entitled to terminate the contract pursuant to a contract provision that stated:

> [Cumberland] reserves the right to stop the Contractor's work immediately should it become aware that the Contractor is in violation of any safety requirements, and [Cumberland] reserves the right at its sole discretion to terminate the contract due to safety concerns or other contract violations. [Cumberland] further reserves the right to inspect Contractor work sites at its discretion.

The trial court dismissed M&M's claim for lost profits. M&M timely filed a notice of appeal.

## II. ISSUES PRESENTED

M&M presents the following issues, as slightly reworded, for review on appeal:

1.      Whether the trial court erred in concluding that Cumberland was entitled to terminate the contract based solely on M&M's claimed failure to follow the safety policy on a single day;

2.      If there was a breach of the contract, did the trial court err in holding that the breach was a material breach;

3.  If there was a material breach of the contract, did the trial court err in holding that termination was permissible when Cumberland failed to give M&M notice of the claimed breach or an opportunity to cure the breach, violating the implied covenant of good faith and fair dealing.

For the following reasons, we affirm the decision of the chancery court and remand for further proceedings.

# III. STANDARD OF REVIEW

When reviewing a trial court's findings following a bench trial, this Court reviews the record *de novo* and presumes that the trial court's findings of fact are correct unless the preponderance of the evidence is otherwise. *Nashville Ford Tractor, Inc. v. Great Am. Ins. Co.*, 194 S.W.3d 415, 424 (Tenn. Ct. App. 2005). We review the trial court's legal conclusions with no presumption of correctness. *Stricklin v. Stricklin*, 490 S.W.3d 8, 11 (Tenn. Ct. App. 2015).

# IV. DISCUSSION

## A. *Factual Findings*

On appeal, M&M challenges only one of the trial court's factual findings – that M&M's work crews performed ungrounded hot work on Monday, April 21, 2014, in violation of Cumberland's safety policy. As previously noted, M&M presented the testimony of foreman Joe Phelps, who adamantly denied that his crew performed ungrounded hot work on April 21. He claimed that the equipment was left in the air the previous workday due to a sudden rain, and the bucket was only raised in the air in order to drain water from it. On the other hand, Abernathy testified that Phelps's crew had two buckets raised in the air with men in the buckets performing energized work. The trial court clearly credited Abernathy's testimony over that of Phelps. The trial court found that Abernathy "observed the crew changing out a pole on an energized line," with both buckets extended "and the men in the buckets were doing energized work" while the trucks were ungrounded. The trial court found that Phelps told Abernathy "he forgot."

As for the second crew, the trial court found that Abernathy observed them "completing the change-out of a pole on an energized line" with ungrounded trucks. M&M's crew foreman did not testify at trial to dispute Abernathy's testimony. M&M simply points to Abernathy's admission that he did not actually see the crew performing hot work with his own eyes because they had completed the pole replacement before he arrived. However, Abernathy also testified that the crew was still in the process of bringing their equipment down from the pole when he observed that the trucks were not grounded. It was reasonable to infer that the crew had completed the hot work without grounding the trucks. M&M does not offer any other explanation.

Abernathy testified that he believed the M&M crews committed safety violations at both locations, and the trial court found that M&M failed to properly ground its trucks

while working on Cumberland's system on April 21. As a general rule, questions regarding the credibility of witnesses, the weight and value of the evidence presented, and the resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. *State v. McCormick*, 494 S.W.3d 673, 678 (Tenn. 2016). "[C]onsiderable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony." *Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn. 2011). Affording due deference to the trial court's credibility assessment, the evidence does not preponderate against the trial court's finding that M&M did in fact fail to properly ground its trucks on April 21.

## B. Material Breach

Next, M&M questions whether its breach of the contract was a *material* breach justifying termination of the contract. M&M claims that even if one or two of its crews breached the contract on April 21 by performing hot work with ungrounded trucks, this "breach was not material enough to justify termination." M&M points out that it worked on the system for almost ten months without incident, no one was hurt, and no grounding issues had been reported aside from those observed at New Shackle Island on April 16 and the two worksites on April 21.

"[I]n order for a contractual breach to be sufficient to relieve the non-breaching party of its contractual obligations, the initial breach must be 'material.'" *DePasquale v. Chamberlain*, 282 S.W.3d 47, 53 (Tenn. Ct. App. 2008) (citing *Adams TV of Memphis, Inc. v. ComCorp of Tenn., Inc.*, 969 S.W.2d 917 (Tenn. Ct. App. 1997)). If the breach of contract "'was slight or minor, as opposed to material or substantial, the nonbreaching party is not relieved of his or her duty of performance, although he or she may recover damages for the breach.'" *Anil Constr. Inc. v. McCollum*, No. W2014-01979-COA-R3-CV, 2015 WL 4274109, at *12 (Tenn. Ct. App. July 15, 2015) (*no perm. app. filed*) (quoting *Peoples Bank v. Lacy*, No. E2011-01489-COA-R3-CV, 2012 WL 1664008, at *5 (Tenn. Ct. App. May 14, 2012)). Tennessee courts consider the following circumstances when considering whether a breach is material:

> "(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any

reasonable assurances;
(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing."

*Forrest Constr. Co. v. Laughlin*, 337 S.W.3d 211, 225-26 (Tenn. Ct. App. 2009) (quoting *Restatement (Second) of Contracts* § 241). We deem these factors only marginally helpful in analyzing the materiality of the breach in the present case. M&M's failure to ground its bucket trucks while performing hot work did not cause any financial damage to Cumberland that could simply be compensated by M&M. It did not result in a defective structure that M&M could repair. M&M completed the pole replacement projects it was assigned. However, M&M's repeated failure to ground its bucket trucks *could* have easily resulted in serious death or injury to M&M's employees, Cumberland's supervisors, or members of the general public. Julia Miller testified at trial that when performing hot work on high voltage lines, "You only get one chance for a mistake usually." Her testimony also demonstrated that the risk was by no means far removed. She acknowledged that, as recently as 2013, the year this contract began, M&M had a situation where energized lines fell and hit one of its trucks. Tony Miller acknowledged the seriousness of the grounding situation by testifying that if he learned about any of his crew foremen deliberately deciding not to ground a truck, he would fire the foreman. Cumberland's manager of engineering, Cook, testified that any incident involving a truck ground and energized work was serious. He recommended terminating the contract with M&M because he was concerned that M&M's course of action was unsafe and was going to lead to serious injury or death on Cumberland's system. General manager Coode described M&M's actions as egregious and testified that he simply could not risk having that type of operation working on Cumberland's system. Julia Miller had already provided assurances that M&M would comply with the grounding policy going forward, but it did not.

The contract between M&M and Cumberland contained the following provisions emphasizing the importance of safety:

[M&M] shall at all times take all reasonable precautions for the safety of employees on the work and of the public, and shall comply with all applicable provisions of federal, state, and local laws, rules, and regulations and building and construction codes, in addition to the safety rules and procedures of the [Cumberland].
. . . .
All construction shall be performed in a safe, thorough, and skillful manner in accordance with the staking sheets, plans and specifications, construction drawings and [Cumberland] staff instructions. [Cumberland] has a strong interest in the safety of employees and the general public. This same

interest is expected to be maintained by anyone that works as a Contractor for this utility. With this in mind [Cumberland] requires that ALL Contractors follow rules that meet or exceed all of those set forth by OSHA, and MUTCD, the most current NESC (National Electric Safety Code), all rules in [Cumberland's] Safety Policies, and all other applicable state and federal laws. This includes all safety related issues . . . .

. . . .

[Cumberland] reserves the right to stop the Contractor's work immediately should it become aware that the Contractor is in violation of any safety requirements, and [Cumberland] reserves the right at its sole discretion to terminate the contract due to safety concerns or other contract violations. [Cumberland] further reserves the right to inspect Contractor work sites at its discretion.

M&M was aware of Cumberland's grounding policy from the very beginning and was aware of the Good Friday directive demanding the use of grounds for all energized work by the following Monday. Still, *multiple* M&M trucks were ungrounded and working on energized lines on Monday, at more than one site. M&M's failure to comply with Cumberland's policy and directive was of sufficient magnitude to constitute a material breach of the contract. Cumberland was not required to wait until someone was injured or killed by a grounding incident. It clearly had the right and ability to terminate the contract due to a material breach involving safety concerns. The existence of an uncured material breach by one party gives the non-breaching party the ability to rescind or "terminate" the contract. *See, e.g.*, *Seaton v. Wise Properties-TN, LLC*, No. E2011-01728-COA-R3-CV, 2012 WL 2362144, at *7 (Tenn. Ct. App. June 22, 2012), *perm. app. denied* (Tenn. June 22, 2012); *Southeastern Eng'g & Dev., Inc. v. Moore*, No. 87-308-II, 1988 WL 30178, at *4 (Tenn. Ct. App. Mar. 30, 1988); *Lake Assocs. v. Pugh*, No. 1, 1987 WL 7962, at *3 (Tenn. Ct. App. Mar. 19, 1987)); *see also Markow v. Pollock*, No. M2008-01720-COA-R3-CV, 2009 WL 4980264, at *5 (Tenn. Ct. App. Dec. 22, 2009) (explaining that when one party materially breaches the contract, the non-breaching party is excused from further performance).[7] The termination of the contract in this case was certainly justified and objectively reasonable.

---

[7]For purposes of this appeal, we need not address whether the contract provision permitting Cumberland to terminate the contract in its sole discretion gave it an unfettered right to terminate the contract in the *absence* of a material breach. Although M&M presents arguments on appeal related to that issue, characterizing it as an issue of first impression in Tennessee, we deem the arguments pretermitted because M&M *did* materially breach the contract, and its material breach was the basis for the termination by Cumberland. *See, e.g.*, *Southeastern Eng'g & Dev., Inc.*, No. 87-308-II, 1988 WL 30178, at *4 (Tenn. Ct. App. Mar. 30, 1988), *perm. app. denied* (Tenn. July 18, 1988) (explaining that a contract's termination provisions had no application to the facts when there was a material breach of the contract that conferred a separate right to rescind and abandon the contract).

## C.    *Notice and Opportunity to Cure*

Finally, M&M argues that the manner in which Cumberland terminated the contract violated the implied covenant of good faith and fair dealing and specific contract provisions regarding notice and an opportunity to cure contract violations.  We disagree with these assertions.

First, M&M cites a contract provision in a section entitled, "Particular Undertakings of [M&M]."  After listing several specific duties for M&M, the contract stated:

> Upon violation by [M&M] of any of the provisions of this section, after written notice of such violation given to [M&M] by the Engineer or the Owner, [M&M] shall immediately correct such violation. Upon failure of [M&M] so to do [sic] the Owner may correct such violation at [M&M]'s expense: Provided, however, that the Owner may, if it deems it necessary or advisable, correct such violation at [M&M]'s expense *without such prior notice to the Bidder*.

(Emphasis added.)  Under this provision, written notice was not absolutely required.  This section did not require Cumberland to provide written notice prior to terminating the contract under the circumstances of this case.

The next provision cited by M&M provided:

> **Section 1.  Completion on Bidder's Default.**  If default shall be made by [M&M] or by any subcontractor in the performance of any of the terms of this Proposal, the Owner, *without in any manner limiting its legal and equitable remedies in the circumstances, may* serve upon [M&M] and the Surety or Sureties, if any, upon the Contractor's Bond or Bonds a written notice requiring [M&M] to cause such default to be corrected forthwith. Unless within twenty (20) days after the service of such notice upon [M&M] such default shall be corrected or arrangements for the correction thereof satisfactory to both the Owner and the Administrator shall be made by [M&M] or its Surety or Sureties, if any, the Owner may take over the construction of the project and prosecute the same to completion by Contract or otherwise for the account and at the expense of [M&M], and [M&M] and its Surety or Sureties, if any, shall be liable to the Owner for any cost or expense in excess of the Contract price occasioned thereby. . . .

13

> **Section 2. Cumulative Remedies**. Every right or remedy herein conferred upon or reserved to the Owner or the Government or the Administrator shall be cumulative, shall be in addition to every right and remedy now or hereafter existing at law or in equity or by statute and the pursuit of any right or remedy shall not be construed as an election.

(Emphasis added.) Again, written notice under this section was not mandatory. We reject M&M's assertion that Cumberland was required to provide it with written notice of the grounding violation and a twenty-day period to correct the situation pursuant to this provision. Cumberland retained its common law rights in the event of a material breach of contract by M&M. *See, e.g.*, *Burke Constr. Co. v. Bd. of Imp. of Paving Dist. No. 20*, 256 S.W. 850, 854 (Ark. 1923) (concluding that a project owner was not required to proceed under a construction contract's take over clause, as it "was a mere option which the contract gave it, and if there was no election to exercise that option, it might pursue the ordinary common-law remedies available to a contracting party whose contract has been breached"); *see also* 64 C.J.S. *Municipal Corporations* § 1419 (explaining that a municipality with a construction contract "is under no duty or obligation to the contractor [] to take steps, by contract or otherwise, to complete the work, and, instead of exercising its option to do so, it may pursue its ordinary common-law remedies for breach of contract").

Finally, M&M argues that Cumberland had a duty to provide it with notice and an opportunity to cure the grounding violation based on the duty of good faith and fair dealing. Tennessee courts have required contracting parties to deal with each other fairly and in good faith, even when such a duty is not explicitly embodied in their contract. *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 198 (Tenn. Ct. App. 1990) (citing *Williams v. Maremount Corp.*, 776 S.W.2d 78, 81 (Tenn. Ct. App. 1988); *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987); *Covington v. Robinson*, 723 S.W.2d 643, 645 (Tenn. Ct. App. 1986)). "Tennessee law recognizes an implied covenant of good faith and fair dealing in every contract." *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 661 (Tenn. 2013). "What this duty consists of, however, depends upon the individual contract in each case." *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996) (quoting *TSC Indus., Inc. v. Tomlin*, 743 S.W.2d 169, 173 (Tenn. Ct. App. 1987)). The common law duty of good faith does not extend beyond the reasonable contractual expectations of the parties. *Id.*

In the construction context, we have imposed an obligation to give parties a reasonable opportunity to perform. *McClain*, 806 S.W.2d at 198; *see Madden Phillips Constr., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 823 (Tenn. Ct. App. 2009) ("Parties to a construction contract in Tennessee must normally give their contractors or subcontractors a reasonable opportunity to perform."). In connection with this obligation,

Tennessee courts have imposed a duty to give notice and an opportunity to cure before terminating the contract for faulty performance. *McClain*, 806 S.W.2d at 198. Even in the absence of an express notice provision in the contract, "the courts will frequently imply an obligation to give notice as a matter of common equity and fairness." *Id.* (citing 3A A. Corbin, *Corbin on Contracts* § 725 (1964)). The notice requirement is "designed to allow the defaulting party to repair the defective work, to reduce the damages, to avoid additional defective performance, and to promote the informal settlement of disputes."[8] *Id.*

Here, the evidence established that M&M's owners were fully aware of the problem that Cumberland perceived with M&M's grounding practice. "From day one" Julia Miller knew that Cumberland required M&M to ground to the system neutral anytime it was performing hot work. When Cumberland's engineers discovered the ungrounded trucks at the New Shackle Island project, they confronted M&M's safety director and instructed him to do something to accomplish grounding of M&M's trucks, and he indicated that he would. The next day, Julia Miller received a telephone call from

_____

[8]As noted here, the purpose of the notice requirement is to allow a defaulting party an opportunity to repair "defective work." *McClain*, 806 S.W.2d at 198. The notice requirement has been applied to commercial construction projects as well as cases involving residential construction. *Bates v. Benedetti*, No. E2010-01379-COA-R3-CV, 2011 WL 978195, at *6 (Tenn. Ct. App. Mar. 21, 2011). Although the case before us involves a type of construction project, it does not involve "defective work" that could be cured by repair. We question whether the notice rule should even extend to require notice and an opportunity to cure an egregious safety violation. *See Alexander & Shankle, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, No. M2006-01168-COA-R3-CV, 2007 WL 2316391, at *9 (Tenn. Ct. App. Aug. 13, 2007) (approving the trial court's finding that notice and an opportunity to cure were not required where the only default was for breach of a "time of the essence" clause, as the notice rule had "no application to such a default"); *Scarborough v. Winn Residential L.L.P./Atl. Terrace Apartments*, 890 A.2d 249, 251 (D.C. 2006) (holding that a landlord had no duty to give notice and an opportunity to cure a lease violation grounded in criminal activity as such activity endangered the safety of other tenants); *Contract Mgmt., Inc. v. Babcock & Wilson Tech. Servs. Y-12, LLC*, No. 3:10-CV-110, 2013 WL 74619, at *38 (E.D. Tenn. Jan. 4, 2013) (concluding that notice was not required for claims when it would not have allowed the party to repair the work at issue, reduce the damages, or serve any other purpose underlying the implied notice requirement); *but see Hope Elec. Enters. v. Schindler Elevator Corp.*, 752 S.E.2d 5, 9 (Ga. Ct. App. 2013) ("even a safety violation could be corrected in the sense that it not be repeated in the future.").

Despite our concerns, however, neither party has argued on appeal that the notice requirement was inapplicable to these circumstances. Instead, Cumberland argues that it provided sufficient notice under the circumstances. We agree. We will assume, for the sake of argument, that the notice requirement would apply here. However, it is not necessary to definitively rule on the applicability of the notice rule to this case because we deem the notice given by Cumberland sufficient under the circumstances, whether it was required or not. This opinion should not be construed as holding that all parties to a construction contract must give notice and an opportunity to cure all safety violations, however egregious. We need not and do not decide that issue under the facts presented here. *See Dick Broad. Co. of Tenn.*, 395 S.W.3d at 673 (J. Koch, concurring) ("courts should tread cautiously when asked to recognize and enforce implied obligations that are not reflected in a written contract.").

Cumberland notifying her of the grounding issue and asking her to remedy it.[9] Then, on Good Friday, she received another telephone call from Cumberland's safety coordinator, giving her explicit directions on how M&M was expected to address the grounding issue. During that call, Cumberland's safety coordinator expressed his concern and also conveyed Cumberland's disapproval of M&M's use of ungrounded bucket trucks. Mrs. Miller agreed at trial that when Chip Miller finished talking to her on Good Friday, "there wasn't any doubt in [her] mind" that effective Monday, April 21, M&M was not to have any more ungrounded trucks working on energized lines. The crew foremen who were approached on the morning of Monday, April 21, were again instructed regarding the grounding policy, although one said that he forgot. This evidence demonstrates that M&M was repeatedly made aware of the problem with its grounding practice, and it simply failed to correct the issue.

We reject M&M's suggestion on appeal that the Good Friday telephone call did not afford it a sufficient opportunity to correct the issue by the following business day. Julia Miller testified at trial that Cumberland's first requirement, regarding putting grounds on all the trucks, was "easy to remedy" because all of the trucks had grounds except for the rental trucks. She and Tony assembled grounds for the rental trucks one afternoon over the weekend. Regarding the second requirement, to utilize the grounds when performing hot work, the Millers simply assumed that their foremen would know to ground the trucks, and they made no attempt to inform the foremen or their safety director about the directive from Cumberland. All of M&M's crews had tailgate meetings every morning to discuss the work to be performed, and the information could have easily been presented at those meetings. As Mrs. Miller recognized, the crews knew or should have known of the policy all along. "If no period of time is required for the performance of the next step to be taken by the defaulting party, it is proper for the other party to demand that the party in default proceed at once or immediately." *Houston Bros. v. Dickson Planing Mill Co.*, 15 S.W.2d 749, 750 (Tenn. 1929). We reject the notion that M&M did not have a reasonable opportunity to comply with the directive.

We also reject M&M's suggestion that Cumberland should have provided it with additional notice of the ungrounded trucks that were discovered on Monday, April 21, and an additional period to achieve compliance with the directive. The extent of a party's "contractual obligations should be tempered by a 'reasonableness' standard." *McClain*, 806 S.W.2d at 198 (citing *Moore v. Moore*, 603 S.W.2d 736, 739 (Tenn. Ct. App. 1980)). "'Notice ought to be given when information material to the performance of a contract is within the peculiar knowledge of *only* one of the contracting parties.'" *Greeter Constr. Co. v. Tice*, 11 S.W.3d 907, 911 (Tenn. Ct. App. 1999) (quoting *McClain*, 806 S.W.2d at 198) (finding that the defect at issue was "well within the knowledge of both contractor

___
[9]Tony and Julia Miller had previously requested that Cumberland notify them directly of any concerns rather than addressing issues with M&M's crew foremen.

and owner"). Here, M&M had sufficient notice of the grounding issue and a reasonable opportunity to correct it.

In terminating the contract, Cumberland acted within its rights as provided by the terms of the contract. "Performance of a contract according to its terms cannot be characterized as bad faith." *Wallace*, 938 S.W.2d at 687. From our review of the record, Cumberland acted reasonably and in good faith throughout the contract period and the events leading to the termination. Accordingly, M&M is not entitled to damages for breach of the implied covenant of good faith and fair dealing.

## V. CONCLUSION

For the aforementioned reasons, the decision of the chancery court is hereby affirmed and remanded for further proceedings. Costs of this appeal are taxed to the appellant, M&M Electrical Contractor, Inc., and its surety, for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE

17