IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 1, 2021

## FITNESS AND READY MEALS LLC ET AL. v. EAT WELL NASHVILLE LLC

**Appeal from the Chancery Court for Williamson County**
**No. 18CV47750      Joseph A. Woodruff, Chancellor**

_____

### No. M2021-00105-COA-R3-CV

_____

A seller entered into an agreement to sell its meal preparation business and assets to a purchaser who was also in the meal preparation business. When the seller failed to perform certain of its obligations under the agreement, the purchaser ceased performing its contractual obligations. The seller filed a breach of contract claim against the purchaser, and the purchaser moved for summary judgment based on the seller committing the first material breach. The trial court granted summary judgment to the purchaser, and the seller appealed. We affirm as modified and remand for a determination of the purchaser's reasonable attorney fees incurred on appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and THOMAS R. FRIERSON, II, J., joined.

Brittany Michelle Speight Bartkowiak and Jay N. Chamness, Franklin, Tennessee, for the appellants, Fitness and Ready Meals LLC and Mary Prosser.

Kevin C. Klein and Ryan Patrick Loofbourrow, Nashville, Tennessee, for the appellee, Eat Well Nashville LLC.

### OPINION

FACTUAL AND PROCEDURAL BACKGROUND

This appeal involves two businesses that sold ready-to-eat meals: Fitness and Ready Meals, LLC ("FARM" or "Seller") and Eat Well Nashville, LLC ("Eat Well" or "Purchaser"). In 2017, FARM's members, Mary Prosser and Jesse Prosser, sold FARM

and its assets to Eat Well via an Asset Purchase Agreement ("the Agreement") that provides, in pertinent part: "Seller agrees to sell, assign, transfer and deliver to Purchaser . . . all of Seller's right, title and interest in and to all of the assets and the operation of the Business as set forth below (collectively referred to as 'Assets')." The Agreement enumerates seven types of assets FARM was to transfer to Eat Well, including "[r]ecipes for meals and snacks."

In exchange for the assets and operation of the business, Eat Well agreed to pay FARM $310,000. Eat Well further agreed to pay $150,000 of the purchase price within two days of the closing date, less any tax withholdings and any debts owed by FARM, and to pay the remaining $136,000 in twelve monthly installments of $11,333.33 that were "due on the last day of each month."

Finally, the Agreement contains covenants by which FARM and the Prossers agreed not to solicit or compete. The non-compete provision appears in section 16 of the Agreement and states that "Sellers shall not directly or indirectly participate in, engage in, be employed by, or be a part of the ownership, management, operation, or control of any business providing any services similar to or competing with [Eat Well's] Services for a period of two (2) years." The Agreement includes, however, the following four exceptions for Ms. Prosser:

> 16.2 The only exceptions will be that Mary Prosser can operate, own or be employed by a business that provides[:]
> 16.2.1 Personal catering services to an active customer list of 20 customers or less. For the sake of this section, "active customer list" is a list of customers that Mary or her company are serving on a weekly basis. For example, Mary could serve 80 customers in a month as long as there are 4 sets of 20 unique customers each week of that month.
> 16.2.2 Juices or cleanses or shelf-stable bone broth or shelf-stable detoxes.
> 16.2.3 Meal planning for individuals and families.
> 16.2.4 Cooking classes to individuals.

The non-solicitation provision also appears in section 16 and provides that FARM and its members agree not to "[s]olicit any person who is or was a customer of the Fitness and Ready Meals business or Eat Well Nashville business or attempt to prevent them from doing business with Purchaser." This provision further provides that FARM and its members agree to not "[i]nterfere with, disrupt, or attempt to disrupt, any past, present, or reasonably foreseeable future relationship with anyone Purchaser may do business with." Unlike the non-compete provision, this provision contains no exceptions.

Following execution of the Agreement, the first monthly payment from Eat Well was due on June 30, 2017. Eat Well was ready to make the payment when it was due and contacted Ms. Prosser on June 22 to request bank information so it could send the June 30

payment, but there was some confusion regarding where to send it because the Prossers were in the midst of a divorce and provided conflicting account information. After Mr. Prosser specified on June 30 that his half of the portion should be sent to his separate bank account, Eat Well immediately sent him his half of the payment. On July 7, once Ms. Prosser clarified the bank account to which her half should be sent, Eat Well submitted the remaining balance of the June 30 payment.

On August 2, 2017, Eat Well sent the Prossers a written notice of breach of contract informing the Prossers it would not make any additional monthly payments due to several instances where Eat Well believed the Prossers had breached the Agreement. The alleged breaches included Ms. Prosser failing to provide "recipes for all menu items" and her violating the non-compete and non-solicitation provisions by preparing meals, free of charge, for Dilvia's Café at the Franklin Athletic Club ("Dilvia's"), FARM's biggest former customer. Eat Well stated that it would resume making monthly payments, less any calculated damages for the breaches, if Ms. Prosser cured some of the breaches. Believing that Ms. Prosser failed to cure any of the breaches, Eat Well made no further payments.

On October 9, 2018, FARM and Ms. Prosser[1] filed a complaint for breach of contract against Eat Well alleging that Eat Well materially breached the Agreement by failing to pay the remaining monthly installments. Eat Well filed an answer and countercomplaint asserting claims for breach of contract, breach of the implied duties of good faith and fair dealing, and intentional interference with business relations. After the parties engaged in some discovery, Eat Well filed a motion for partial summary judgment on FARM's breach of contract claim. Eat Well argued that it was entitled to summary judgment on that claim because it did not cease making the monthly installment payments until Ms. Prosser materially breached the contract by failing to provide FARM's recipes and by violating the Agreement's non-compete and non-solicitation provisions.

After hearing the matter, the trial court entered a memorandum and order on October 13, 2020, granting Eat Well's motion for partial summary judgment. The court then dismissed the case because Eat Well voluntarily dismissed all of its counterclaims. Thereafter, Eat Well moved for an award of its reasonable attorney fees under section 16.8 of the Agreement. The trial court granted the motion and awarded Eat Well its reasonable attorney fees and litigation expenses in the total amount of $78,501.57.[2]

FARM appealed and presents several issues that we consolidate and restate as follows: whether the trial court erred in granting summary judgment to Eat Well.

---

[1] Mr. Prosser was not a party in the trial court and is not one on appeal.

[2] FARM contends for the first time in its reply brief that the trial court erred in its determination to award attorney fees to Eat Well. "Issues raised for the first time in a reply brief are waived." *Hughes v. Tenn. Bd. of Prob. & Parole*, 514 S.W.3d 707, 724 (Tenn. 2017). Therefore, we decline to consider this issue.

STANDARD OF REVIEW

We review a trial court's summary judgment determination de novo, with no presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). This means that "we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Id.* We "must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor." *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *see also Acute Care Holdings, LLC v. Houston Cnty.*, No. M2018-01534-COA-R3-CV, 2019 WL 2337434, at *4 (Tenn. Ct. App. June 3, 2019).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." TENN. R. CIV. P. 56.04. A disputed fact is material if it is determinative of the claim or defense at issue in the motion. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008) (citing *Byrd v. Hall*, 847 S.W.2d 208, 215 (Tenn. 1993)). When a party moves for summary judgment but does not have the burden of proof at trial, the moving party must submit evidence either "affirmatively negating an essential element of the nonmoving party's claim" or "demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264. Once the moving party has satisfied this requirement, the nonmoving party "'may not rest upon the mere allegations or denials of [its] pleading.'" *Id.* at 265 (quoting TENN. R. CIV. P. 56.06). Rather, the nonmoving party must respond and produce affidavits, depositions, responses to interrogatories, or other evidence that "set forth specific facts showing that there is a genuine issue for trial." TENN. R. CIV. P. 56.06; *see also Rye*, 477 S.W.3d at 265. If the nonmoving party fails to respond in this way, "summary judgment, if appropriate, shall be entered against the [nonmoving] party." TENN. R. CIV. P. 56.06. If the moving party fails to show he or she is entitled to summary judgment, however, "'the non-movant's burden to produce either supporting affidavits or discovery materials is not triggered and the motion for summary judgment fails.'" *Martin*, 271 S.W.3d at 83 (quoting *McCarley v. W. Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998)).

ANALYSIS

I. <u>Breach of contract claim</u>.

In its complaint, FARM asserted only one claim against Eat Well: breach of contract. This issue requires us to interpret the Agreement. Our Supreme Court has explained the principles of contract interpretation as follows:

The interpretation of a contract is a matter of law and therefore is reviewed de novo. *See Hamblen County v. City of Morristown*, 656 S.W.2d 331, 335-36 (Tenn. 1983). "When resolving disputes concerning contract interpretation, our task is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). If a contract's language is clear and unambiguous, then the literal meaning of the language controls the outcome of the contract dispute. *See Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002). Additionally, "all provisions in the contract should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract." *Guiliano*, 995 S.W.2d at 95.

*Teter v. Republic Parking Sys., Inc.*, 181 S.W.3d 330, 342 (Tenn. 2005); *see also Bynum v. Sampson*, 605 S.W.3d 173, 180 (Tenn. Ct. App. 2020) (citing *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011)).

To succeed on a breach of contract claim, a party must establish three elements: "'(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract.'" *Bynum*, 605 S.W.3d at 180 (quoting *ARC Lifemed, Inc. AMC-Tenn., Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). The parties' main dispute pertains to the second element—a nonperformance that amounts to a breach of the Agreement. If a party's nonperformance amounts to a breach of contract but the breach "'was slight or minor, as opposed to material or substantial, the nonbreaching party is not relieved of his or her duty of performance, although he or she may recover damages for the breach.'" *Anil Constr. Inc. v. McCollum*, No. W2014-01979-COA-R3-CV, 2015 WL 4274109, at *12 (Tenn. Ct. App. July 15, 2015) (quoting *Peoples Bank v. Lacy*, No. E2011-01489-COA-R3-CV, 2012 WL 1664008, at *5 (Tenn. Ct. App. May 14, 2012)); *see also M & M Elec. Contractor, Inc. v. Cumberland Elec. Membership Corp.*, 529 S.W.3d 413, 423 (Tenn. Ct. App. 2016). When a party's nonperformance amounts to a material breach, however, the non-breaching party is relieved of its contractual obligations. *M & M Elec. Contractor, Inc.*, 529 S.W.3d at 423 (citing *DePasquale v. Chamberlain*, 282 S.W.3d 47, 53 (Tenn. Ct. App. 2008)).

Courts consider the following factors to determine whether a breach is material:

"(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing."

*Forrest Constr. Co, LLC v. Laughlin*, 337 S.W.3d 211, 225-26 (Tenn. Ct. App. 2009) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981)); *see also M & M Elec. Contractor, Inc.*, 529 S.W.3d at 423. In situations where both parties to a contract commit a material breach, the party that committed the first material breach is "'not entitled to damages stemming from the other party's later material breach of the same contract.'" *Forrest Constr. Co, LLC*, 337 S.W.3d at 226 (quoting *United Brake Sys., Inc. v. Am. Envtl. Prot.*, 963 S.W.2d 749, 756 (Tenn. Ct. App.1997)); *see also McClain v. Kimbrough Constr. Co., Inc.*, 806 S.W.2d 194,199 (Tenn. Ct. App. 1990).

In the present case, it is undisputed that both parties, at different points in time, stopped performing their contractual obligations. Therefore, resolution of this issue turns on whose nonperformance constituted the first material breach of the Agreement. After applying the material breach factors, the trial court concluded that FARM committed the first material breach when it failed to "transfer and deliver" its recipes to Eat Well and when Ms. Prosser violated the Agreement's non-compete and non-solicitation provisions by providing free meals for Dilvia's over a two-week period. FARM contends that the trial court erred in reaching this conclusion because evidence in the record showed that Eat Well made the first material breach when it made the first monthly installment payment seven days late. We first consider whether Eat Well's failure to timely pay the first installment payment constituted a material breach that relieved FARM of its obligation to perform.

A.  Late payment.

According to FARM, Eat Well materially breached the Agreement because it submitted the first installment payment seven days late. We disagree. A payment made seven days after the due date is admittedly late, but it is a very short delay. Generally, a non-material breach occurs in circumstances where there has been "a very short delay in payment" or a "failure to make installment payments [that] does not interfere with the unpaid party's ability to perform, such as where the second party is still able to obtain the requisite labor and materials to do the work on time." Steven W. Feldman, *Performance, Breach, and Discharge*, 22 TENN. PRAC. CONTRACT LAW & PRACTICE § 11:27 (2021). The record contains no evidence showing that Eat Well's short delay in payment interfered with FARM's ability to perform. Indeed, FARM points to no evidence in the record showing that the short delay in payment affected FARM at all. In light of the foregoing, Eat Well's seven-day delay in making the first installment payment was not a material breach of the Agreement and FARM was therefore not relieved of its obligation to perform. We affirm the trial court's holding in this regard.

B. Failure to provide recipes.

1. Not reduced to writing.

We next consider whether FARM committed the first material breach when it failed to deliver its recipes to Eat Well. The Agreement provides that "Seller agrees to sell, assign, *transfer and deliver* to Purchaser . . . all of Seller's right, title and interest to all of the assets . . . as set forth below." (Emphasis added). Schedule 1.1(d) expressly states that "[r]ecipes for meals and snacks" is included in the assets Eat Well acquired under the Agreement's licenses and authorizations provision. Thus, the plain and unambiguous language of the Agreement required FARM to "transfer and deliver" all of its "recipes for meals and snacks" to Eat Well.

FARM does not dispute that it was required to "transfer and deliver" its recipes to Eat Well. FARM's contention centers on the trial court's interpretation of the language quoted above as requiring FARM to deliver *written* copies of its recipes to Eat Well. According to FARM, the Agreement did not contain any such requirement. FARM maintains that it transferred and delivered its recipes to Eat Well when Ms. Prosser "discuss[ed]" recipes and menu items with Eat Well's head chef. We respectfully disagree.

The Agreement does not define the term "recipe," but its plain meaning is "a list of ingredients and a set of instructions that tell you how to cook something." *Recipe*, COLLINS https://www.collinsdictionary.com/us/dictionary/english/recipe (last accessed Feb. 18, 2022). A "list" is "a record of short pieces of information, usually written or printed." *List*, CAMBRIDGE https://dictionary.cambridge.org/us/dictionary/english/list (last accessed Feb. 18, 2022). Thus, we are constrained to believe that the parties intended for FARM to write out its recipes and then provide them to Eat Well. Ms. Prosser "discussing" FARM's recipes with Eat Well's head chef does not satisfy this requirement. Consequently, FARM breached the Agreement by failing to "transfer and deliver" its recipes to Eat Well.

Applying the material breach factors to these facts, we conclude that this breach was material. FARM's failure to "transfer and deliver" its recipes deprived Eat Well of the benefit it reasonably expected under the Agreement because, without FARM's recipes, Eat Well could not provide the same product as FARM; in fact, two of FARM's former customers testified that the meals did not taste as good after Eat Well purchased FARM. Lastly, by FARM's own admission, it never cured this breach.

2. Not asserted prior to closing.

FARM next contends that, although written recipes were not provided to Eat Well, that failure could not constitute a material breach because the Agreement required Eat Well "to ascertain the recipes prior to closing." Essentially, FARM's argument is that the Agreement placed the burden on Eat Well to insist on written copies of the recipes prior to

closing, and Eat Well's failure to do so amounted to a waiver of Eat Well's right to assert that FARM breached by failing to deliver the recipes. To support its argument, FARM relies on the Agreement's inspection of assets and business location provision that states, in relevant part, as follows:

> Between the Effective Date and the Closing Date, Purchaser and Purchaser's agents and designees shall have the right, upon reasonable prior notice and agreement with Seller, to enter the Business Location for the purposes of making any investigations and inspections of the Assets . . . as Purchaser may reasonably require to assess the condition of the Assets . . . . If Purchaser determines that the Assets . . . are not acceptable to Purchaser, Purchaser may immediately terminate this Agreement.

The phrase "shall have the right" to inspect FARM's assets provided Eat Well with a right to inspect FARM's assets prior to the closing date and to terminate the Agreement if the assets were unacceptable. Although inspecting all of FARM's assets to determine if there were written recipes prior to closing certainly would have been the prudent thing to do, nothing in this provision, or elsewhere in the Agreement, states that Eat Well was required to do so. Therefore, the Agreement permitted Eat Well to sign the contract and then seek the recipes after the closing date.

We note that "[a] party 'waive[s] its right to assert first material breach as a bar to recovery if it accepts the benefits of the contract with knowledge of the breach.'" *White v. Empire Express, Inc.*, 395 S.W.3d 696, 715-16 (Tenn. Ct. App. 2012) (quoting *Madden Phillips Const., Inc. v. GGAT Dev. Corp.*, 315 S.W.3d 800, 813 (Tenn. Ct. App. 2009)). But:

> "mere efforts on the part of an innocent party to persuade the promisor, who repudiates his agreement, to reject that repudiation and proceed honorably in the performance of his agreement have been held not to involve a waiver of the innocent party's right to avail himself of the breach after efforts finally prove unsuccessful."

*Madden Phillips Const., Inc.*, 315 S.W.3d at 813 (quoting *W.F. Holt Co. v. A & E Elec. Co.*, 665 S.W.2d 722, 733-34 (Tenn. Ct. App. 1983) (emphasis omitted). Throughout June 2017, Eat Well continued asking FARM to provide its recipes, and FARM's continued failure to do so served as a basis for the "Notice of Breach" sent on August 2, 2017. These unsuccessful efforts by Eat Well to persuade FARM not to repudiate the Agreement did not constitute a waiver of Eat Well's right to assert that FARM committed the first material breach by failing to deliver its recipes.

C. Non-compete and non-solicitation covenants.

1. Enforceability.

The trial court concluded that FARM also committed a material breach by violating the Agreement's non-compete and non-solicitation provisions when Ms. Prosser provided meals for Dilvia's. Agreements that restrain trade, such as covenants not to compete and not to solicit, are generally disfavored in Tennessee. *Murfreesboro Med. Clinic, P.A. v. Udom*, 166 S.W.3d 674, 678 (Tenn. 2005). Nevertheless, such covenants that are "'incidental to the sale and transfer of a trade or business, and which purport[] to bind the seller not to engage in the same business in competition with the purchaser, [are] lawful and enforceable,'" if they "are reasonable and go no further than affording a fair protection to the buyer." *Greene Cnty. Tire & Supply, Inc. v. Spurlin*, 338 S.W.2d 597, 599-600 (Tenn. 1960) (quoting *Scott v. McReynolds*, 255 S.W.2d 401, 403 (Tenn. Ct. App. 1952)). "[T]he reasonableness of the restraint necessary to secure the buyer fair protection in receiving the benefits for which he made the purchase 'is to be determined by reference to the nature of the business, the manner in which it has been conducted and its territorial extent.'" *Id.* at 600 (quoting 36 AM. JUR., § 65); *see also Money & Tax Help, Inc. v. Moody*, 180 S.W.3d 561, 565 (Tenn. Ct. App. 2005) ("The inquiry as to reasonableness under the circumstances is a fact-specific one, and there is no inflexible formula for determining reasonableness; "'each case must stand or fall on its own facts.'" ) (quoting *Allright Auto Parks, Inc. v. Berry*, 409 S.W.2d 361, 363 (Tenn. 1966).

The restrictive covenants in this case prevent FARM from engaging in the same business in competition with Eat Well. Although the Agreement expressly limits the non-compete provision to a duration of two years, it does not specify a territorial limitation, nor does it specify a time limit for the non-solicitation provision. On appeal and at trial, FARM argues that the failure to specify territorial and time limits rendered the covenants unenforceable because they are ambiguous. The trial court rejected this argument and concluded that, based on the facts of the case, it could impose the following limitations:

> From the facts, and the plain terms contained in the Agreement, this Court concludes as a matter of law these covenants were created for the purpose of protecting Eat Well's new assets, by restricting Mary Prosser's competitive behavior in the same geographical region as Eat Well, and to the same customer base that once belonged to FARM. Therefore, the Non-Compete and No-Solicitation Covenants are both reasonable, and enforceable, limited to the geographic area in which Eat Well operates, and for the duration of Eat Well's operations.

FARM is correct that the failure to explicitly state time and territorial limits creates some ambiguity, but "[i]t is the duty of the courts to construe written contracts, if their meaning be in doubt, so as to give them effect rather than destroy them" because it is

"presumed that one intended to execute a valid rather than an invalid contract." *Scott*, 255 S.W.2d at 405. Thus, this ambiguity does not necessarily render the covenants unenforceable.

This Court considered a similar issue in *Butts v. Birdwell*, 503 S.W.2d 930 (Tenn. Ct. App. 1973) *abrogated on other grounds by Kesterson v. Varner*, 172 S.W.3d 556 (Tenn. Ct. App. 2005)). That case involved a sale agreement with an oral agreement not to compete that provided no time limitation and merely stated that the territory was limited to the "route and with customers with whom [the seller] had been doing business." *Butts*, 503 S.W.2d at 933. The trial court concluded that the oral agreement was unenforceable. *Id.* at 935. We reversed, finding that the evidence pertaining to the oral agreement was sufficient to infer "that both [the buyer] and [and seller] were talking about and dealing with the route in three Counties where [the seller] had established outlets for his products." *Id.* at 937. We considered this to be "a reasonable [territorial] limitation as respects a covenant not to compete." *Id.* In regard to the lack of a time limitation, we stated,

> [W]e are constrained to believe that a reasonable interpretation of the agreement . . . was that so long as [the buyer] continued to operate on the route which had been established by [the seller] . . . and as long as he served the accounts he had taken over from [the seller] through the agreement of sale, [the seller] was obligated not to interfere with that established route and those customers while [the buyer] continued to serve them.

*Id.*

The most recent case to apply the decision in *Butts* is *Carrigan v. Arthur J. Gallagher Risk Mgmt. Servs., Inc.*, 870 F. Supp. 2d 542 (M.D. Tenn. 2012). That case involved a sale agreement which contained a time limitation of three years but was limitless in geographical scope. *Carrigan*, 870 F. Supp.2d at 546-47. Relying on *Butts*, the federal court stated that courts may impose reasonable limitations on restrictive covenants when parties fails to make them explicit. *Id.* at 550. The federal court then imposed a reasonable territorial limit on the covenant not to compete that covered only eight states—the states where the buyer was licensed to do business, states where the accounts he purchased were based, and the other states in which he had already marketed. *Id.* at 552.

Based on these principles, we conclude that the trial court did not err in determining that the covenants were enforceable and in imposing limitations on them based on the Agreement and the facts of the case. We agree with the trial court that a reasonable interpretation of the Agreement shows that these covenants "were created for the purpose of protecting Eat Well's new assets by limiting Mary Prosser's competitive behavior in the same geographical region as Eat Well" and to the same customer base that once belonged to FARM. Thus, limiting the two-year non-compete provision to the geographic area in which Eat Well operates was reasonable because, in addition to selling its business, FARM

- 10 -

sold its customer list to Eat Well; those former customers would most likely be loyal to FARM and Ms. Prosser and would buy from Ms. Prosser if given the opportunity. This limitation allows Eat Well two years to win over those customers. Then, after two years, Ms. Prosser may engage in a meal-preparation business that competes with Eat Well.

Limiting the non-solicitation provision's geographic area to that in which Eat Well operates is also reasonable due to the need to allow Eat Well time to persuade FARM's former customers to buy from Eat Well. We believe, however, that, under the circumstances of this case, limiting the non-solicitation provision to the duration of Eat Well's operations was too broad to be reasonable.[3] A reasonable interpretation of the Agreement that protects Eat Well's benefits under the Agreement is one that more closely resembles the one imposed by the *Butts* court—limiting the duration to as long as the buyer continued to serve the route and customers "he had taken over from the [the seller] through the agreement." *Butts*, at 503 S.W.3d at 937. Allowing Ms. Prosser to engage in a business competing against Eat Well after two years but prohibiting her from soliciting FARM's former customers for as long as Eat Well serves them protects the benefits Eat Well acquired under the Agreement. Therefore, we modify the duration of the non-solicitation provision to as long as Eat Well serves the customer base it took over from FARM through the Agreement.

### 2. Violations.

FARM next contends that the trial court erred in concluding that it violated the Agreement's non-compete provision when Ms. Prosser provided meals to Dilvia's. Prior to May 26, 2017, FARM delivered an average of 100-150 meals per week to Dilvia's, for a weekly revenue of approximately $900. Eat Well met with Gara Abdullah, the owner of Dilvia's, after purchasing FARM and agreed to continue selling meals to the café in the same manner as FARM. It is undisputed that on July 10, 2017, Ms. Prosser approached Mr. Abdullah and offered to provide Dilvia's with free meals. Mr. Abdullah agreed, and Ms. Prosser then, over a two-week period, provided approximately thirty meals to Dilvia's to sell to its customers. During that two-week period, Eat Well sold no meals to Dilvia's.

FARM contends that Ms. Prosser's actions did not violate the non-compete provision because they fell within the exception carved out in the Agreement permitting

---

[3] FARM also contends that the non-solicitation provision is overly broad because it states that Ms. Prosser may not "[i]nterfere with, disrupt or attempt to disrupt, any past, present, *or reasonably foreseeable future relationship with anyone Purchaser may do business with*." (Emphasis added). She is correct that, in the employer-employee context, this Court has found that covenants restricting contact with future clients would be too broad and vague to be enforceable. *Thompson, Breeding, Dunn, Creswell & Sparks v. Bowlin*, 765 S.W.2d 743, 745 (Tenn. Ct. App. 1987). Although not expressly stated, it is clear from the trial court's order that it took this into consideration and limited the non-solicitation provision "to the same customer base that once belonged to FARM." In other words, the provision was limited in scope to those customers of FARM's prior to the sale of the business. This argument is without merit.

Ms. Prosser to provide "[p]ersonal catering services to an active customer list of 20 customers or less." We disagree. The Agreement does not define the phrase "personal catering services." When reading the entire Agreement, however, it is clear that the parties intended for Ms. Prosser to be able to prepare meals for a limited number of customers, either in the customer's kitchen or out of a commercial kitchen, for the customer's own consumption. Thus, as the trial court stated, "Providing packaged meals to a commercial venture for resale . . . is not 'personal catering services.'" Ms. Prosser's actions, therefore, were not covered by the exceptions in the Agreement and constituted a violation of the non-compete provision.

The undisputed facts also show that Ms. Prosser's actions violated the non-solicitation provision. Unlike the non-compete provision, this provision contains no exceptions. It expressly prohibits Ms. Prosser from interfering with or disrupting Eat Well's business with FARM's former customers. Dilvia's was a significant former customer of FARM. Eat Well met with Mr. Abdullah after purchasing FARM and reached an agreement for Eat Well to continue providing meals to the café just like FARM had done. When Ms. Prosser provided meals to Dilvia's over the two-week period, Dilvia's purchased no meals from Eat Well. Her actions, therefore, clearly interfered with and disrupted Eat Well's business with one of its customers.

Applying the material breach factors, we conclude: (1) Eat Well expected that it would acquire FARM's assets and that it would have a fair opportunity to retain Dilvia's as a customer, but Ms. Prosser's actions deprived Eat Well of that benefit; (2) Ms. Prosser knew, or should have known, that she was not to interfere with Eat Well's business with FARM's former customers. Thus, we agree with the trial court's determination that Ms. Prosser's violations of the non-compete and non-solicitation provisions constituted a material breach.

FARM's material breaches occurred before Eat Well ceased making installment payments. Therefore, FARM committed the first material breach of the Agreement and relieved Eat Well from its obligation to perform. We conclude that the trial court did not err in granting summary judgment to Eat Well.

III. Attorney fees.

Eat Well seeks an award of its attorney fees incurred on appeal. Litigants are generally required to pay their own attorney fees unless a statute or contract provision provides otherwise. *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009). If a valid contract provides that a prevailing party be awarded its reasonable attorney fees, we have no discretion to deny a request for such fees. *Eberbach v. Eberbach*, 535 S.W.3d 467, 478 (Tenn. 2017).

The Agreement contains the following attorney fees provision:

In the event that litigation results from or arises out of this Agreement or the performance thereof, the losing party agrees to reimburse the prevailing party's reasonable attorney's fees, court costs, and all other expenses, whether or not taxable by the court as costs, in addition to any other relief to which the prevailing party may be entitled.

Eat Well argues it is entitled to its fees under this provision because this appeal focused on whether the Agreement was breached and, therefore, constituted litigation arising from the Agreement or performance of obligations under the Agreement. In response, FARM asserts that Eat Well is not entitled to recover its attorney fees under the Agreement because this appeal did not concern Eat Well's breach of contract claims that were voluntarily dismissed in the trial court. Thus, FARM contends, Eat Well may not be deemed a prevailing party. Nothing in the Agreement provides that, to be a prevailing party, a party must succeed on a claim it asserted. Rather, the Agreement provides that if litigation arises from the Agreement "or the performance thereof, the losing party agrees to reimburse the prevailing party's reasonable attorney's fees." The plain and unambiguous meaning of this language is that a party merely needs to succeed in litigation arising from the Agreement or performance thereof. Although Eat Well's counterclaims are not at issue here, this appeal still constitutes litigation arising from the Agreement because it concerns FARM's breach of that contract. Eat Well prevailed on all the issues relating to that claim. Therefore, Eat Well is a prevailing party and is entitled to an award of its reasonable attorney fees incurred on appeal.

CONCLUSION

The judgment of the trial court is affirmed as modified, and the matter is remanded for a determination of Eat Well's reasonable attorney fees incurred on appeal. Costs of this appeal are assessed against the appellants, Fitness and Ready Meals, LLC and Mary Prosser, for which execution may issue if necessary.

_/s/ *Andy D. Bennett*_____
ANDY D. BENNETT, JUDGE

- 13 -